WEST, A MINOR, *v.* BOARD OF TRUSTEES OF MIAMI
UNIVERSITY AND MIAMI NORMAL SCHOOL ET AL.

(Decided December 1, 1931.)

_Messrs. McLaughlin & Staker,_ for plaintiff.

_Mr. Gilbert Bettman,_ attorney general, _Mr. Earl R. Hoover_ and _Messrs. Williams, Sohngen, Fitton & Pierce,_ for defendants.

Ross, P. J. This case is presented to this court on appeal from the court of common pleas of Butler county.

The issues are contained in the amended petition and answer.

The suit was instituted by Jean West, a minor, by her father, her natural guardian.

She alleges that she is a graduate of the public grade and high schools of the city of Portsmouth, Ohio, which has always been her legal residence; that she holds a diploma from such high school, which is of the first grade as defined by Ohio law; that the Miami Normal School is an institution established and maintained by the state of Ohio, is attached to Miami University and _governed by the board of trustees of such university;_ that Alfred Horatio Upham is the president of the university and its administrative head; that Ernest James Ashbaugh is the dean and administrative head of Miami Normal School; that possessing the necessary qualifications on the 10th of September, 1930, she was admitted to such normal school and completed a course of study in the first semester, ter-

minating February 4, 1931, paid the required fees and charges for entrance upon the second semester, and continued her attendance in such school until notified on April 3, 1931, by the president that she was about to be excluded and barred from admission to classes, and that on April 14, 1931, "the Faculty of Miami University passed an order directing that plaintiff be excluded from said school," and that "said order of exclusion is not being entered because of any violation upon her part of any lawful regulation or any rule of conduct reasonably necessary for the preservation of moral conduct or discipline," and that "said order of expulsion is unlawful and will deny to plaintiff her legal right to attend said school and to participate in the instructions given therein."

She prays that upon final hearing a permanent injunction shall issue against the defendants, including the board of trustees of Miami University, restraining them from putting into effect the order of exclusion and that the defendants may be ordered "to admit and receive the plaintiff as a student in said school."

The answer admits the residence, previous education, matriculation of the plaintiff in the so-called Miami Normal School and the identity and status of the administrative boards and officers as alleged. The other allegations of the amended petition are denied, and it is alleged that the Miami Normal School, so-called by plaintiff, is a part of the school of education of Miami University, established by the board of trustees of Miami University in June, 1927, having since operated under the rules promulgated by the faculty of Miami University; that at

the time of plaintiff's matriculation in such "College of Education," designated by plaintiff as a normal school, there was a regulation requiring freshmen in the two-year course entered by plaintiff to earn 25 credit points for the first semester and 60 credit points for the entire year in such course and that failure so to do should result in the dismissal of the student; that there was a further rule in such school and university, and adopted by the faculty thereof, that a student reported low in studies at the end of any grading period or semester might be placed upon probation by action of the academic council of the university, and when so placed upon probation might be later dropped if grades fell below the probation standard.

It is further alleged that the plaintiff during the first semester attained less than the number of credit points necessary to meet the scholastic requirements provided for in the rules, in that her credit points earned were 23 as against the required 25 points, and that plaintiff, therefore, was requested to withdraw from the university, but that thereafter, at her request, she was permitted by the faculty of the school to enter the second semester, upon probation, under terms requiring her at the end of nine weeks to have earned 30 credit points, that at the end of such period she had earned only 19 points and failed to meet the requirements of her probation, and that thereupon on April 7, 1931, the academic council of the university requested plaintiff to withdraw from the university, and her father was so notified, and, in accordance with information given him by the council, took an appeal to the faculty of Miami University, which unanimously

affirmed the decision of the council that plaintiff should withdraw from the university, it being further alleged that such dismissal is but temporary and only for the remainder of the semester, and that the plaintiff has a right under the rules to enter the second semester of the succeeding year.

The answer further alleges "that the scholastic requirements with which the plaintiff failed to comply are in nowise arbitrary or unreasonable, are uniform, affecting all students in the same course of study in the same manner, and that the same do not constitute an abuse of discretion on the part of the faculty of said university and of said School of Education described in plaintiff's petition as Miami Normal School."

No reply having been filed to the answer, the new matter alleged therein may be taken as admitted to be true by plaintiff.

The facts are as follows:

Jean West, a resident citizen of Ohio, holding a diploma from a first grade high school at Portsmouth, Ohio, on September 10, 1930, entered a two-year course in the normal school at Miami University for the purpose of acquiring the necessary education to become a teacher.

The university had adopted certain rules and regulations previous to the admission of plaintiff, among which were the following:

"No student shall be dropped during the college year unless his parents were notified before that time of his poor work, but re-enrollment may be denied according to the rule below."

"A student who has been dropped twice for poor scholarship shall not be re-admitted."

"A student dropped for scholarship shall not be readmitted until after one entire semester has elapsed."

"A student dropped for scholarship during or at end of second semester shall not be admitted to summer school during the period of his suspension."

"Rules for minimum scholastic requirement: (Each college or school may designate additional scholastic requirements to fit its special aims.)

"Freshman:

"a. Probation if less than 19 credit points.

"b. Warned if from 19 to 22 credit points."

Under the rules of the normal school (or as it is styled in Miami University, "School of Education"), in force some time before the admittance of plaintiff, an average grade of C was required of students enrolled in the two-year course selected by the plaintiff. Two credit points are allowed for each semester hour of "C" work. The plaintiff was taking 16 hours of work and was, therefore, required to maintain a general average of 32 points for the semester and 64 points for the two semesters or school year.

This standard, shortly after the plaintiff's admission to the university was lowered to a requirement of 25 points for the first semester and 60 for the entire year. The newly admitted students, shortly after their entrance into the university, were notified of these rules and requirements, and there is nothing to indicate that plaintiff was an exception or could not have secured this information, which naturally must have been of great interest to her.

The method of grading is set out in the university catalogue as follows:

"The grade of a student in each of his courses is determined by the combined results of examinations and the daily recitations. Standing is expressed, according to proficiency, in grades A, B, C, D, E, F.

"Grade A denotes excellent scholarship; grade B, good scholarship; grade C, fair scholarship; grade D, poor scholarship; grade E, a condition which may be removed by second examination; grade F, a failure, removed only by repetition of the subject in class. W denotes that the work of the semester has not been entirely completed by the student."

The values assigned to the grading symbols are as follows:

Each semester hour of "A" = 4 points.
Each semester hour of "B" = 3 points.
Each semester hour of "C" = 2 points.
Each semester hour of "D" = 1 point.
Each semester hour of "E" = 0 points.
Each semester hour of "F" = 0 points.

A semester hour is one hour a week in the subject designated. At the end of the first half of the first semester the plaintiff and her father were notified that she had earned 22 points, secured as indicated below:

Art Education 271 2 hours grade C (2) 4 credit points.

Art Education 171 2 hours grade B (3) 6 credit points.

Education 171 4 hours grade D (1) 4 credit points.

English 170 3 hours grade D (1) 3 credit points.

Geography 170 3 hours grade D (1) 3 credit points.

Music 170 1 hour grade E (Condition) 2 credit points.

Physical Education

Total 22 points.

Both the plaintiff and her father were cautioned that a failure on the part of plaintiff to earn 25 points at the close of the first semester would result in plaintiff being refused the privilege of continuing the year at the university.

At the close of the first semester the plaintiff and her father were notified that the plaintiff had earned but 23 points as against 25 required, and that she was denied readmittance to the university during the second semester under the rules of the school and university. Her grades at the close of the first semester were as follows:

Art Education 271 2 hours grade C, 4 credit points.

Art Education 171 2 hours grade C, 4 credit points.

Education 171 4 hours grade D, 4 credit points.

English 171 3 hours grade C, 6 credit points.

Geography 170 3 hours grade D, 3 credit points.

Music 170 1 hour grade F, 0 credit points.

Physical Education 101-102 1 hour grades B, C 2 credit points.

Total 23 credit points.

At her request, however, she was permitted to enter the second semester upon a four-year art education course, in the school of education or normal school designed to perfect students as teachers of art in the public schools. She was, however, advised that she would be expected to earn 30 points at the close of the half semester, a period of nine

weeks. This she failed to do, being successful in securing only a credit of 19 points.

On April 2, 1931, she was notified by the president of the university, through a letter sent to her home at Portsmouth and transmitted, so that it would reach her before her return from the vacation period, that she had 19 credit points as follows:

"Miami University
"Oxford, Ohio
"April 2, 1931
"A. H. Upham, President
"A. K. Morris, Ass't to Pres.

"Miss Jean West, 3218 Scioto Trail, Portsmouth, Ohio.

"My dear Miss West: The Freshman Advisers Committee in their meeting on Wednesday, April first, in view of the fact that you were advised that it would be necessary for you to make thirty credit points at the nine weeks grade report and having fallen below this requirement, felt obliged to recommend that you be withdrawn from the University at this time. This will be presented for final approval to the Academic Council next Tuesday, April 7th. The Committee felt you ought to receive this notification before you returned so that you could talk over future plans while you are at home.

"You had a total of 19 credit points and your grades were as follows: Geography 170 E, History 100 D, Education 101 D, Art 162 C, English 160 C, Physical Education 103 B.

"You will not be eligible to re-enter Miami University before the beginning of the second semester next February and then only upon the approval of the Admissions Committee.

"With all best wishes for your future undertakings, I am,

"Yours sincerely,

"(Signed) A. K. MORRIS,

Chairman of Freshman Advisers Committee."

It is contended that the plaintiff and her father were both ignorant of the terms of the probation. Such lack of interest, if it existed, again seems strange in view of the importance to the plaintiff of the information she now states she did not possess. There was evidence that she was seasonably given advice as to the terms of her probation.

An appeal from the order of the academic council was taken to the faculty by the father of plaintiff, the latter body confirming the order of the council, and the order of suspension was made final by the faculty, the governing body of the school and university.

The present action was brought to enjoin the university from carrying out its order of suspension. The trial court granted a permanent injunction in the following terms:

"This day this cause was heard upon the petition of the plaintiff, the answer of the defendants, the evidence and the briefs of counsel and was submitted to the court and, upon consideration thereof, the court, being fully advised, finds that the allegations of plaintiff's petition are true and that the plaintiff has been unlawfully excluded from attendance at Miami University Normal School or School of Education and denied a legal right to attend said school by an order of the faculty of said Miami University and that the plaintiff is entitled to the relief prayed for in her petition.

"It is therefore considered and decreed that the defendants, The Board of Trustees of Miami University, Alfred Horatio Upham, President of Miami University, and Ernest James Ashbaugh, Dean of Miami Normal School or School of Education, be, and they hereby are perpetually enjoined as prayed for in said petition, to-wit: from putting into effect said order of Faculty excluding plaintiff from attending said school and further said defendants are mandatorily enjoined to receive the plaintiff as a student in said University subject to all lawful rules and regulations appertaining thereto and it is further considered that the plaintiff recover from said defendants her costs herein expended, taxed at $......, to all of which defendants except.

"And said defendants having given notice of their intention to appeal this cause to the Court of Appeals of Butler County, Ohio, the court for that purpose fixes the amount of appeal bond in the sum of Three Hundred Dollars ($300.00) to be given by the defendants with sureties to the approval of the Clerk of this Court conditioned according to law."

Under the provisions of Section 12235, General Code, the injunction was not suspended by the appeal.

The plaintiff continued on through the second semester and received still more unsatisfactory grades. She now is a student in another university.

The effect of the still forceful mandate of the court of common pleas, vitiating the order of the university that the plaintiff be suspended for a full semester, coupled with the existence of an opinion of that court pronouncing the law applicable to the facts set forth herein, furnish sufficient basis for a

consideration of this case upon appeal and a statement of the law applicable thereto.

The burden of proving the existence of illegality in the act of the university in suspending the plaintiff rests squarely upon the plaintiff.

It is admitted by the plaintiff that the school of education or normal school is a part of the Miami University, a state-supported institution, and that such university is governed by a board of trustees. The government of the university is provided for in General Code, Section 7939, as follows: "The government of Miami University shall be vested in twenty-seven trustees, to be appointed by the governor by and with the advice and consent of the senate. Nine trustees shall be appointed every third year, for a term of nine years, beginning on the first day of March in the year of their appointment. Vacancies in the board of trustees shall be filled for the unexpired term in the same manner. In addition to the trustees herein provided for, the director of education shall be a member of the board of trustees of Miami University, with power to speak but not to vote therein."

The term "government" incorporates a trinity of functions: The enactment of laws, rules and regulations; the judicial construction of same as applicable to their suggested violation; and their execution. This term "government" is broad enough in its scope, as applied to a university or college, or school, to include administrative rules and regulations affecting scholastic procedure as well as disciplinary measures affecting only moral conduct or order.

There is nothing in the pleadings, stipulation, or

record to indicate that the rules and regulations involved were not approved by the board of trustees, in whom rested the power of government of the university and school.

No appeal was taken by the plaintiff to the trustees. Until the contrary appears, it may be taken for granted that the faculty acted in conformity with the dictates of the board of trustees, and in conformity with the powers given such faculty by the charter hereinafter noted. The continued existence of the rules and regulations as to scholastic standards, coupled with their enforcement from time to time, supports such conclusion.

The following is quoted from the statute creating Miami University:

"Be it enacted by the General Assembly of the state of Ohio, that there shall be an university established and instituted, in the manner hereafter directed, within that part of the country known by the name of John Cleve Symmes' purchase, which university shall be designated by the name and style of the Miami University, for the instruction of youth in all the various branches of the liberal arts and sciences, for the promotion of good education, virtue, religion and morality, and for conferring all the literary honours granted in similar institutions; and the benefits and advantages of said university shall be open to all the citizens within this state."

"Be it further enacted, that the said corporation shall have power and authority from time to time, to make and ordain rules, ordinances and by-laws for the government of the corporation, not incompatible with the laws of the United States or this

state, and the same to repeal as occasion may require, and also to determine the salaries, emoluments and tenures of their several officers."

"Be it further enacted, that the president and such professors as the corporation shall appoint, shall be styled the faculty of the university, and shall have power with the approbation of the corporation or trustees, from time to time, to ordain, regulate and establish the mode and course of education and instruction to be pursued in the university, and also with the approbation of the corporation as aforesaid, to make public and execute such code of rules, regulations and by-laws as they shall deem necessary for the well ordering and good government of the university, and to repeal or amend any part thereof, which rules, regulations and by-laws, shall continue in force until altered or repealed by the corporation, and the faculty shall lay before the corporation from time to time, accurate statements of all their proceedings; moreover, the faculty shall direct and cause to be holden in the said university, at least once in every year, a public examination, at which time the faculty shall attend, when each class of the students shall be examined relative to the proficiency they shall have made in the particular branches of education in which they shall have been instructed."

"Be it further enacted, that the legislature of this state may grant any further and greater powers to, or alter, limit or restrain in any of the powers by this act, vested in the said corporation, as shall be necessary to promote the best interest of the said university, with all necessary powers and authority for the better aid, preservation and government

thereof.'' 7 Ohio Laws, 184, Sections 1, 5, 8 and 15.

Obviously such rules and regulations are subject to the limitations that they must be reasonable and not arbitrarily applied, and shall not conflict with the law of the state, or United States. Otherwise, they are binding upon all concerned.

The contention of the plaintiff is that the university and school, being established and supported by the state, are open to all its citizens, who have the right to continue as students therein as long as their conduct shall not offend against reasonable rules, requiring order, decency, and decorum.

This contention is at once answered by the statute law of this state. In addition to the pertinent statute already noted, the following statutes are germane:

Section 7897, General Code, provides for the creation and establishment of the normal school at Miami University.

General Code, Section 7898, provides: ''Boards of trustees of such universities shall maintain at their respective institutions a normal school which shall be co-ordinate with existing courses of instruction, and be maintained in such a state of efficiency as to provide proper theoretical and practical training for all students desiring to prepare themselves for the work of teaching. Such normal schools, in each case shall be under the general charge and management of the respective boards of trustees of such universities.''

General Code, Section 7650, defines a college thus: ''A college is a school of a higher grade than a high school, in which instruction in the high school branches is carried beyond the scope of the high

school and other advanced studies are pursued, or a school in which special, technical or professional studies are pursued, and which, when legally organized, may have the right to confer degrees in agreement with the terms of the law regulating its practices or its charter; or in the absence of legislative direction, in agreement with the practices of the better institutions of learning of their respective kinds in the United States."

General Code, Section 7658, provides that the holder of a diploma from a first grade high school shall be admitted without examination to any state-supported college or university, but concludes with: "This section shall not be construed to deny the right of a college of law, medicine, or other specialized education to require college training for admission; nor the right of a department of music or other art to require particular preliminary training or talent."

General Code, Section 7659, specifically sets forth the entrance requirements for institutions for the preparation of elementary teachers, but concludes with the following: "The right of normal schools and colleges to require additional tests of general ability and scholarship for entrance to teachers' courses shall not be abridged."

A "University" is defined by the Oxford English Dictionary to be: "The whole body of teachers and scholars engaged, at a particular place, in giving and receiving instruction in the higher branches of learning; such persons associated together as a society or corporate body, with a definite organization and acknowledged powers and privileges (esp. that of conferring degrees), and forming an institution

for the promotion of education in the higher and more important branches of learning  *  *  *."

Education is manifestly progressive, ability to properly approach a study of the higher branches being necessarily predicated upon proficiency in the subjects leading up to them.

The wisdom of the statutory entrance requirements is, therefore, obvious. But, it is contended, that having once passed such requirements a student, though, thereafter, in the opinion of the governing body, showing evidence of inability to progress with the normal student, must be permitted to continue unmolested as long as such student may desire. There are many reasons why such procedure would be harmful both to the student, the institution, and the student body—one of which is that the higher branches of education are presented to the average student who is presumed to have reached an appropriate stage of maturity in mental development.

With no reflection upon any student, it may become apparent upon entering into the work of a college or normal school that such normal stage has not been reached. A few months' absence from the institution, permitting natural maturing of the mental faculties, as well as independent study in such supporting subjects as may be necessary, cannot help but be a benefit to the individual. On the other hand, it would not be reasonable to require that the progress of the great body of students, possessing average intellectual development, be retarded pending the acquisition by the individual student of the necessary proficiency to proceed.

There has been no showing that the scholastic

standards set by the governing body of the university and school are not such as to be easily met by the average student.

It is clear that the faculty, consisting of the teaching body of the institution, must be the tribunal, under the direction and controlling jurisdiction of the trustees, to pass upon the fitness of the students to continue their study of the courses selected or required.

It is contended that the Constitution of 1802 contains provisions sustaining the position of the plaintiff. Even if this were true, these provisions do not appear in the subsequent Constitutions of the state, and the position of the plaintiff is untenable in the face of the acts of the Legislature hereinbefore noted.

Nothing has been shown requiring us to find that the rules and regulations in question are unreasonable.

Some stress has been laid upon the fact that the student was suspended in mid-term. Such a procedure might cause unnecessary embarrassment upon the part of a student, and such fact seems to be recognized in the rules of the university which contemplate appropriate action at the close of the semester.

It is to be noted, however, that the university in the instant case, at the request of the student, permitted an extended period of probation under terms in which she at least acquiesced, and which she did not fulfill.

The institution should not be penalized for leniency in the application of its rules, or for a result, a mid-term suspension, which would not have

occurred had not such leniency been extended. It is to be noted further that the student was notified of her final suspension when she was still at home, and during a mid-term vacation. Even the harshness of the situation thus created by her failure to meet the terms of the probation was ameliorated. The unnecessary harshness of a mid-term suspension can be easily appreciated and is generally deprecated, although within the power of the governing body of the university; where, however, such mid-term suspension becomes a condition to which the student may or may not subject himself, even such criticism is removed.

Nothing appears in any controlling case contrary to that which has been said.

The injunction ought not to have been granted, and is dissolved.

We find the issues in favor of the defendants, and a decree may be taken accordingly.

*Injunction denied.*

HAMILTON and CUSHING, JJ., concur.