Bernard H. GREENHILL, Plaintiff,

v.

Ray V. BAILEY et al., Defendants.

Civ. No. 73-186-2.

United States District Court,
S. D. Iowa, C. D.

June 25, 1974.

Raymond Rosenberg, Glenn L. Norris, Des Moines, Iowa, for plaintiff.

Richard C. Turner, Atty. Gen. of Iowa, Elizabeth Nolan, Asst. Atty. Gen. of Iowa, and Arthur O. Leff, Iowa City, Iowa, for defendants.

## MEMORANDUM AND RULING

STUART, District Judge.

This action was instituted by plaintiff, formerly a student of the University of Iowa College of Medicine, claiming he has been wrongfully deprived of his rightful position as a student in good standing in the medical school by the arbitrary and capricious action and bad faith of the defendants in dismissing him from medical school for purported academic shortcomings. The cause of action is alleged to arise under the Fourteenth Amendment to the United States Constitution and 28 U.S.C. § 1343(3) and 42 U.S.C. §§ 1983 and 1988. Jurisdiction of this Court is invoked under 28 U.S.C. §§ 1331 and 1343.

Plaintiff claims that his status as a student in good standing at the University of Iowa College of Medicine is "liberty" and "property" within the meaning of the Fourteenth Amendment to the Constitution of the United States and that he was denied procedural due process because he was not allowed to appear at hearings of the Junior Class Promotions Committee on June 5, 1973 and the Executive Committee and Medical Council on June 14th and 28th and July 26th, citing Board of Regents of State College v. Roth (1972), 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548. Plaintiff also claims he was denied substantive due process because the school authorities acted arbitrarily, capriciously and in bad faith.

■ Although the school does not claim that plaintiff was afforded the type of procedural due process hearing required by the cases, I need not decide whether the claimed status is "liberty" or "property" within the protection of the 14th Amendment because the cases are clear that notice and hearing are not required when a student is dismissed for failure to meet academic standards. The leading case is Connelly v. University of Vermont and State Agricultural College (D.Vt., 1965), 244 F.Supp. 156, 159. See Brookins v. Bonnell (E.D.Pa., 1973), 362 F.Supp. 379, 382; Wong v. Regents of the University of California (1971), 15 Cal.App.3rd 823, 93 Cal.Rptr. 502, 508; Militana v. University of Miami (Fla., 1970), 236 So.2d 162, 164; Cieboter v. O'Connell (Fla., 1970), 236 So.2d 470, 472–473; Mustell v. Rose (1968), 282 Ala. 358, 211 So.2d 489, 498. Although most of these citations preceded Board of Regents v. Roth, the Court's reluctance, thus far, to enter into the academic field and dispute a decision by those particularly qualified to make it, persuades me that the United States Supreme Court would not require a due process hearing under these circumstances.

■ The cases cited above also stand for the proposition that the courts will not review a decision of the school authorities relating to the academic qualifications of the students. See also: Depperman v. University of Kentucky (E.D. Ky., 1974), 371 F.Supp. 73, 76; Foley v. Benedict (1932), 122 Tex. 193, 55 S. W.2d 805, 809; West v. Board of Trustees of Miami University, etc. (1931), 41 Ohio App. 367, 181 N.E. 144; Barnard v. Inhabitants of Shelbourne (1915), 222 Mass. 76, 109 N.E. 818; Gleason v. University of Minnesota (1908), 104 Minn. 359, 116 N.W. 650; Miller v. Dailey (1902), 136 Cal. 212, 68 P. 1029.

■ However, plaintiff is not without remedy when it is alleged that a decision by the school authorities to dismiss a student, supposedly for academic deficiencies, was in fact made arbitrarily and capriciously and in bad faith. Plaintiff may, as in the instant case, bring an action so alleging and the Court will receive and consider evidence on this issue. See the above cited cases.

In Connelly v. University of Vermont and State Agricultural College (D.Vt., 1965), 244 F.Supp. 156, the Court said:

Where a medical student has been dismissed for a failure to attain a proper standard of scholarship, two questions may be involved; the first is, was the student in fact delinquent in his studies or unfit for the practice of medicine? The second question is, were the school authorities motivated by malice or bad faith in dismissing the student, or did they act arbitrarily or capriciously? In general, the first question is not a matter for judicial review. However, a student dismissal motivated by bad faith, arbitrariness or capriciousness may be actionable. (Citations) p. 159.

The effect of these decisions is to give the school authorities absolute discretion in determining whether a student has been delinquent in his studies, and to place the burden on the student of showing that his dismissal was motivated by arbitrariness, capriciousness or bad faith. The reason for this rule is that in matters of

scholarship, the school authorities are uniquely qualified by training and experience to judge the qualifications of a student, and efficiency of instruction depends in no small degree upon the school faculty's freedom from interference from other noneducational tribunals. It is only when the school authorities abuse this discretion that a court may interfere with their decision to dismiss a student. p. 160.

Whether the plaintiff should or should not have received a passing grade for the period in question is a matter wholly within the jurisdiction of the school authorities, who alone are qualified to make such a determination. p. 161.

However, to the extent that the plaintiff has alleged his dismissal was for reasons other than the quality of his work, or in bad faith, he has stated a cause of action. p. 161.

I therefore have examined the evidence to determine whether plaintiff's dismissal was for academic deficiencies or the result of arbitrary and capricious action of the school authorities taken in bad faith.

In 1969 plaintiff applied for admission to the University of Iowa College of Medicine (Medical School). Although he met minimum requirements for admission he was not accepted because better qualified applicants filled all available positions. (His undergraduate grade point was 2.54. The average for students admitted to medical school was about 3.4.) In 1970 plaintiff was admitted to the College of Osteopathic Medicine and Surgery (COMS) after his second application to the Medical School was turned down. He satisfactorily completed the first two years at COMS although he stood very low in the class (1st year—106 out of 110, 2nd year—98 out of 102).

In October 1971, plaintiff applied for admission to the Medical School as a student of Advanced Standing. In April 1972 he took Part I of the National Board (required of most transfer students) in a specially administered test and failed to pass. Plaintiff and plaintiff's father, a dermatologist, requested permission for plaintiff to take Part I in June 1972. This time plaintiff passed the examination and resubmitted his application for admission. The Admissions Committee reconsidered and approved his application to start his junior year of the Medical School in August 1972. The rest of the junior class started in June and he missed the clerkship in Surgery which he was to make up later on.

Plaintiff failed the written examination in Obstetrics and Gynecology with a grade of 59. He was given a makeup examination and scored lower the second time. He was required to repeat the entire clerkship.

Plaintiff received the lowest grade in, but passed, pediatrics.

Plaintiff also failed the clerkship in Internal Medicine. The staff of the Department of Internal Medicine also recommended that he take the internal medicine portion of the examination in Introduction to Clinical Medicine before the department would consider a decision to allow him to repeat the clerkship.

On May 31, 1973, Dr. Mark, chairman of the junior clerkship committee in Internal Medicine reported to Dr. Baker, Dean of Student Affairs, that plaintiff failed the junior clerkship in Internal Medicine and had serious deficiencies in basic knowledge and skills in clinical medicine and care of patients.

On June 5, 1973 the Junior Promotions Committee voted to suspend plaintiff. This decision was ratified by the Medical Council on June 14, 1973 and reconsidered and ratified again on June 28th and July 26th.

Plaintiff claims he was "steamrolled out of medical school on the basis of the subjective evaluation of a few doctors in the internal medicine department who, without ever making any effort to objectively verify their conclusions, made a recommendation that plaintiff was such a poor student that absent some extra-

ordinary action, he could not be allowed to repeat the clerkship on internal medicine".

Plaintiff's evidence to support this contention was primarily directed toward proving that his scholastic work in medical school was satisfactory and did not support the decision to suspend him, the inference being that the decision, not supported by the record, must have been arbitrary, capricious and in bad faith. Plaintiff relied on his own testimony, the depositions of doctors with whom he had contact in medical school, school records and the fact that he passed Part II of the National Boards.

The Court has been unable to reconcile the concept of the school authorities' "absolute discretion" to dismiss a student for failure to meet academic standards with a review by the court of the academic record to determine whether the decision was arbitrary and capricious because the academic record shows he should have passed. The courts would appear to be encroaching on the area we have repeatedly stated is reserved to the academicians. There is nothing in the record to suggest that the dismissal was motivated by animosity or ill will. To the contrary plaintiff appears to have been well liked. Plaintiff is asking the Court to look at the evidence of his scholastic ability; find the judgment of the school authorities is not supported by the evidence; and find their action arbitrary, capricious and in bad faith. The courts have thus far declined to usurp this function. In my opinion there must be some positive evidence of ill will or bad motive before the Court could hold the action arbitrary, capricious or in bad faith. The absence of such evidence coupled with the authorities' discretion to determine scholastic grades requires a decision in favor of defendants.

Perhaps this conclusion should end this case, however, it is also my opinion that the plaintiff has failed to meet the burden of proving his dismissal was arbitrary and capricious and in bad faith under the evidence presented concerning his medical school record.

It is true that the decision to dismiss this defendant was in a large part based on the subjective judgment of the faculty and faculty committees. So many factors are involved in the capability of a person to function successfully as a physician that it would be impossible to make a determination on objective written tests. The judgment of the faculty who have had close personal contact with the student and observed his conduct on the "rounds", his handling of the patients' cases, his response to actual medical problems and other pertinent matters is of utmost importance. There is no suggestion that the subjective judgments made were other than honest opinions of the doctors who made them.

Each case of possible dismissal is handled by the medical school individually and judged upon its own merits. Full and careful consideration is given. I do not believe this plaintiff was treated any differently than anyone else would have been in his situation. If plaintiff was treated unfairly at any time, it was when the Admissions Committee succumbed to the persistent efforts to have him admitted in spite of his comparatively poor scholastic record. Plaintiff's difficulties were foreseeable. Such error should not be compounded however by requiring the medical school to keep and graduate a student who in the collective judgment of the proper authorities is not qualified.

Plaintiff was accepted as an advance student after having had his application for admission refused two times and after he had failed Part I of the National Boards once. His undergraduate grade point was about 2.5 when the average student admitted had a 3.4. He was near the bottom of the class the first two years at COMS. Of the four major junior clerkships, he failed two (Obstetrics and Gynecology, and Internal Medicine) and received the lowest passing grade in Pediatrics. In my opinion the strong dissatisfaction expressed by the Department of Internal Medicine focused

the attention of the Junior Promotions Committee on the plaintiff's entire record, which record justified the action taken by the school authorities in dismissing plaintiff.

Plaintiff also claims the Junior Class Promotions Committee acted arbitrarily and capriciously because (1) there are no meaningful standards regulating academic advancement or suspension at the College of Medicine, (2) plaintiff was given no warning of his academic deficiencies or an opportunity to correct the same, (3) plaintiff was given no warning of his imperiled academic status because of events occurring prior to his clerkship in Internal Medicine, (4) the Department of Internal Medicine used subjective judgment with respect to areas of academic concern in which the usual and customary practice of the profession is to use objective tests, and (5) the plaintiff was treated radically different from his peers who were in a like situation. Although the foregoing discussion answers most of these specific allegations inferentially, direct comment is appropriate.

The first four claims relate to the practices of the College of Medicine in supervising, grading and passing the medical students. The court feels that this is an area best left to the medical authorities. They are proud of the Iowa College of Medicine and its reputation. The prime concern is the graduation of competent and complete practicing physicians. The courts are not competent to dictate the procedures and methods they should employ to accomplish their purposes.

The Court has been impressed with the full and individual evaluation made of each medical student. Each faculty member of a departmental clerkship who has had contact with an individual student completes a student profile form evaluating the various aspects of his professional and personal qualifications and recommends a failing or passing grade. A Departmental Committee decides whether a student should pass or fail the particular department's clerk-

ship. If two major clerkships are failed, the promotions committee for the particular class decides what action should be taken. Students are questioned to determine if they have personal problems or health problems which could account for the difficulties. Efforts are made to help solve underlying difficulties to which scholastic problems could be attributable. No collateral problems were involved here.

There is no full set of objective standards regulating advancement. As previously pointed out many of the decisions are subjective. Evaluations of who will be and what it takes to make a good doctor are in a large part subjective and should be made by those with this particular knowledge and training.

Although plaintiff was not actually told he was failing or in academic difficulty, there were several warnings which should have put him on notice. As a decision to fail or pass is not made until the clerkship is completed and the student is evaluated by a committee, he could not have been informed of this fact until that time. Daily discussions and conferences, corrections and suggestions made should have alerted plaintiff to his impending problems.

The evidence does not support plaintiff's contentions that the Iowa Medical School does not follow the custom and practice of the profession in teaching and grading students. Plaintiff's reliance on his successful passing of Part II of the National Boards is not convincing to the court. Objective testing alone cannot determine his qualifications in a particular specialty. Graphic evidence of this is shown by the fact that he passed the section on surgery when he hadn't even had the surgical clerkship. The fact he passed the obstetrics and gynecology section does not persuade the court he was erroneously failed in this departmental exam.

Evidence that plaintiff was treated radically different than others in a like situation would tend to prove he was dismissed arbitrarily and capriciously.

However, the evidence does not show prejudicial treatment. He received fair and impartial treatment in view of his academic situation. In the Court's opinion plaintiff received preferential treatment when he was admitted in the first place. It is doubtful if many students with his academic record would have been permitted to transfer as advanced students.

For the reasons stated the Court finds that plaintiff's complaint should be dismissed and the Clerk of the Court is authorized and directed to enter judgment against the plaintiff and in favor of the defendants for the cost of this case.