Alice Olson and Celia Russ, Appellants, v. George W. Rossetter et al., Appellees.

Gen. No. 43,866.

Opinion filed February 3, 1947. Rehearing denied February 17, 1947. Released for publication February 17, 1947.

SHULMAN, SHULMAN & ABRAMS, of Chicago, for appellants; MEYER ABRAMS, of Chicago, of counsel.

SONNENSCHEIN, BERKSON, LAUTMANN, LEVINSON & MORSE, of Chicago, for certain appellees.

MORRIS G. LEONARD and ARTHUR A. GOLDBERG, both of Chicago, for certain other appellee; ARTHUR A. GOLDBERG and ISAAC E. FERGUSON, both of Chicago, of counsel.

MR. JUSTICE NIEMEYER delivered the opinion of the court.

Plaintiffs, holders of stock trust certificates for 28 shares of approximately 9,000 shares of the capital stock of 1617 Belmont Company, a corporation (hereafter called the corporation), held under a voting trust agreement dated October 15, 1935, appeal from a decree dismissing for want of equity their amended complaint seeking to have declared null and void an amendment of the trust agreement purporting to ex-

tend it from October 15, 1945 to October 15, 1955, and a lease alleged to have been executed by the voting trustees in 1944 leasing the theatre portion of the premises of the corporation for a period of 10 years from October 1945. They also appeal from a prior order entered on motion of the defendant Theatre Amusement Company, the lessee of the theatre, dismissing the amended complaint as to that defendant. The defendants, the voting trustees and the corporation, filed a joint answer admitting most of the allegations of the complaint, denying some, and moving to strike other allegations. On the trial the only evidence introduced was a letter from the trustees to the holders of trust certificates advising them that the amendment extending the trust agreement to August 15, 1955 had become effective, only two holders of certificates representing 30 shares having objected.

The material facts not controverted are: The corporation was organized as an Illinois corporation pursuant to a reorganization plan approved under section 77B of the National Bankruptcy Act by the district court of the United States for the northern district of Illinois, under which the property described in the complaint, improved by 9 stores, 67 apartments and a theatre, was conveyed to the corporation, which issued its stock in exchange for first mortgage bonds— the bondholders receiving trust certificates, issued by voting trustees under a trust agreement approved by the court, for the shares of stock to which they were to be ultimately entitled. The plaintiffs, Alice Olson and Celia Russ, respectively, are holders of trust certificates for 20 and 8 shares of the capital stock of the corporation, registered in their respective names since September 3, 1940 and December 14, 1943. The parties to the trust agreement are the corporation, the persons entitled to trust certificates, and the trustees. Article 6 provides that the aggregate annual compensation of the trustees shall not exceed 1 per cent of the annual gross income derived from the property of

the corporation; that the trustees may act as directors and also as officers of the corporation. Article 7 provides: "This trust agreement shall terminate, in any event, on the fifteenth day of October 1945, without notice by or to, or action on the part of the trustees, or any other parties hereto, but it may be terminated at an earlier date by a resolution of two trustees, or by the consent of the certificate holders" expressed on referendum directed to be held within 60 days of the expiration of biennial periods ending on the 15th day of October of the years 1937, 1939, 1941 and 1943, if the trust had not been theretofore terminated. If the referendum is at a meeting of the certificate holders, not less than 15 days' notice shall be given of the time and place of the meeting, but if the referendum is conducted by mail and without a meeting, the trustees shall, at least 30 days before October 15 of the year of the referendum, mail notice thereof to all of the record owners of trust certificates. Article 8, section 6 provides: "This trust agreement may be amended, altered or modified by the resolution of all the trustees. If it is the opinion of the trustees (which shall be conclusive) that any such amendment, alteration or modification will materially affect the rights of the holders of trust certificates, the trustees shall notify the registered holders of all trust certificates . . . of the nature of such amendment, alteration or modification, not less than ten days prior to the date on which it is proposed such amendment, modification or alteration is to become effective, and such amendment, alteration or modification shall not become effective if at or prior to such date the holders of trust certificates representing 33 1/3% or more of the capital stock outstanding issued to the trustees shall in writing advise the trustees of their objection to and dissent therefrom."

Under date of May 1, 1945 the trustees sent to the holders of trust certificates a letter, headed "IMPORTANT—Proposed Extension of Trust Agreement," in

which they stated that 9,899.75 shares of a total of 12,109 shares outstanding were held by the trustees pursuant to the trust agreement; that the agreement would expire October 15, 1945; that the holders of trust certificates were approximately 750, and resided in 34 states, Washington, D. C., and Belgium; that if the trust were terminated, few security holders would be able to attend shareholders' meetings; that it would be necessary to solicit proxies for every meeting; that as a result it would be difficult and perhaps expensive to obtain a quorum for meetings, and the conduct of necessary corporate business, such as voting liquidating dividends, would be delayed; that if the trust were terminated it would be comparatively easy for speculators buying the stock to elect a majority of the directors and obtain control of the corporation; that the very purpose of the trust might be defeated and benefits for a few might be obtained by persons with adverse interests; that "If, however, the stock of the corporation continues to be held in trust, you will be assured of the continuation of the sound and conservative policies which have been carried out during the past ten years. If the trust is ended, the certificate holders will have no assurance as to the integrity of management and operation, nor will there be any limit on the fees and expenses which may be imposed upon the corporation. This is in strong contrast to the definite limitations on charges under the present trust agreement. . . . As your trustees, we are thoroughly familiar with the affairs of your company and have been actively in touch with all phases of its management. Accordingly, we sincerely believe that a continuation of the present administration of the affairs of your company will permit the uninterrupted carrying out of policies which have been adopted with a view towards the maximum realization by security holders upon their original investments''; that the trust agreement provides that it may be amended; that

the trustees have unanimously adopted resolutions amending it to provide that the term of the trust agreement be extended to October 15, 1955; that as in the past, there will be a referendum each two years, commencing October 15, 1947, to determine whether the trust shall terminate or continue; that there will be no other changes in the trust agreement; that in accordance with the provisions of the trust agreement and the resolutions of the trustees, the amendment will become effective on May 21, 1945, unless at or prior to such date the holders of trust certificates representing 33 1/3 per cent or more of the shares for which trust certificates are outstanding shall advise the trustees in writing of their objection thereto; that if a certificate holder wished to object to the amendment he should immediately send a written dissent to the trustees; that if he favored the amendment he need take no action; that they, the trustees, "strongly recommend that the stock trust be extended for an additional period of ten years." On May 12, 1945 the plaintiff Alice Olson sent a communication to the trustees stating that she had acquired her shares from her deceased sister; that she desired a sale of the property in the present market, and that it was her desire "to communicate with my fellow beneficiaries for the purpose of opposing the continuation of the trust, and to effect a sale without further delay," and asking among other things that the trustees furnish to her attorneys the names and addresses of all beneficiaries so that she could communicate with them in person and also for the purpose of calling a meeting to discuss the subject matter of a sale or extension of the trust or its rejection. The trustees replied May 16, 1945, acknowledging receipt of plaintiff's communication on the 14th instant and stating: "Your request for a list of certificate holders, so that you may communicate with them regarding a sale of the property or regarding an extension of the trust, is palpably made in bad faith.

. . . After waiting until May 12 to write to the trustees, it is obvious that you have no sincere desire to send a communication to the certificate holders in opposition to the extension of the trust, to be considered by them within the 20-day period for dissents. . . . Lists of shareholders are subject to uses detrimental to the majority shareholders, therefore the trustees feel that such lists should not be furnished unless it appears that the purpose is legitimate and the interests of the majority shareholders will not be endangered. For the reasons indicated, the trustees have concluded that your request for a list of certificate holders should be rejected.'' The names and addresses of the certificate holders were not furnished to the plaintiffs, and, as stated above, the trustees advised the beneficiaries that the amendment had become effective.

Plaintiffs contend that the trust agreement cannot be amended by extending the life of the trust; that the voting trustees improperly influenced the beneficiaries not to dissent, and improperly denied plaintiffs an opportunity to communicate with the beneficiaries in opposition to the amendment. Defendants contend that the amendment was proper, citing *Morris v. The Broadview, Inc.*, 328 Ill. App. 267, where we held that the extension of the voting trust there involved was authorized under a provision permitting the trust agreement to be ''amended, altered or modified,'' there being ''nothing in the trust agreement restricting or limiting the application of the words.'' The *Morris* case is authority in the matter before us only if there is nothing in the trust agreement under consideration restricting and limiting the application of the words ''may be amended, altered or modified.'' The provisions in the agreement in the *Morris* case and in the instant case relating to amendment, alteration or modification are substantially alike. The provisions governing the life and termination of the re-

spective agreements differ widely. The power, if any, to extend the life of the trust agreement before us must be determined by the language of that agreement, interpreted according to established rules of construction of contracts. Courts of equity, like courts of law, must construe written contracts according to the intention of the parties as expressed in the terms of the contract. *Domeyer v. O'Connell,* 364 Ill. 467; *Atchison, T. & S. F. R. Co. v. Chicago & W. I. R. Co.,* 162 Ill. 632; *Hayes v. O'Brien,* 149 Ill. 403, 414. In arriving at that intention, effect must be given to each clause, word and term employed by the parties, rejecting none as meaningless or surplusage unless absolutely necessary. *Mittel v. Karl,* 133 Ill. 65; *Gage v. Cameron,* 212 Ill. 146; *Brittain v. Farrington,* 318 Ill. 474; *Rhomberg v. Texas Co.,* 379 Ill. 430. Where there are two clauses in a contract which are so entirely repugnant to each other that they cannot stand together, the first will be received and the last will be rejected. *Thomas Hoist Co. v. William J. Newman Co.,* 365 Ill. 160. Repugnant words which contravene the evident purpose and intention of the agreement as clearly expressed may be transposed or rejected, or limited and controlled by other and prior provisions. 54 Am Jur., Trusts, sec. 17. Where in an agreement there are general and special provisions relating to the same thing, the special provisions control. 12 Am. Jur., Contracts, sec. 244. The present contract was evidently drawn with care. It was submitted to the creditors in the bankruptcy proceeding and, on final hearing, had approval of the creditors and the court. The language of the provision relating to termination of the contract is clear and unambiguous. Article 7, entitled "Termination," commences: "This Trust Agreement shall terminate, *in any event,* on the fifteenth day of October, 1945, *without notice by or to, or action on the part of the Trustees, or any other parties hereto. . . ."* (Italics ours.) The words

"in any event" are in common use and their meaning is generally understood. In *Edwards v. Laird,* 22 Cal. App. 398, 134 Pac. 365, where they were used in relation to the continuance of a contract in force they were held to mean "no matter what else may be," or "whatever may happen." As here used they clearly express the intention that no matter what happens or is done, the trust agreement is to terminate on October 15, 1945, or, stated conversely, that in no event shall the agreement continue beyond that date. In *Bechtel v. Rorick,* 65 Ohio App. 455, 30 N. E. (2d) 451, 455, the Presiding Judge LLOYD, specially concurring, but dissenting from the majority opinion upholding the right to amend by extending the life of the trust, said: "The words, 'but in no event shall this agreement continue for a longer entire period than six years from the date hereof' are so definite and explicit a limitation as to time as to obviate any other construction than that they were intended, as in fact they do, to exclude any attempted extension of the contract beyond the time so fixed, and to apply to the deposit contract in its entirety. There is nothing uncertain or equivocal in their meaning or purpose . . ." The construction we have given to the contract before us is strengthened by the remaining provisions of article 7, which provide that the agreement shall terminate on October 15, 1945, "without notice by or to, or action on the part of the Trustees, or any other parties hereto"; that "it may be terminated at an earlier date by resolution of two (2) Trustees; that if the trustees fail to terminate it they must, without action or request on the part of the beneficiaries, hold a referendum on the question of the termination of the contract within 60 days of the expiration of each biennial period ending on the 15th day of October of the years 1937, 1939, 1941 and 1943, if the trust has not been theretofore terminated. These provisions, more favorable to the termination of the contract than is

usually found in voting trust and liquidation agreements, evidence the intention of the parties to terminate the trust at the earliest date, prior to its expiration date, deemed advisable by the trustees or the certificate holders, and negative an intent to have the trust extended indefinitely. Nowhere is there any express provision for extension of the trust. The language relied upon to extend it is in article 8, section 6, and reads: ''This trust agreement may be amended, altered or modified by the resolution of all the trustees.'' To hold that this language, which standing alone applies to all provisions of the contract, outweighs the specific language of article 7 relating to the termination of the contract on October 15, 1945, requires rejection of the phrase ''in any event'' as meaningless or surplusage, defeats the express intention and purpose to terminate the trust, in any event, on October 15, 1945 without notice by or to, or action on the part of the trustees or any other parties thereto, and permits the general provision of article 8 to control and nullify the express language of article 7 relating to the termination of the contract, contrary to the rules of construction stated above. In conformity with these rules, the power of amendment, alteration and modification given in article 8 must be limited to provisions of the agreement other than those in article 7 providing for the termination of the contract, in any event, on October 15, 1945.

██ Plaintiffs' further objection to the validity of the amendment is based on the conduct of the trustees in procuring its adoption. Plaintiffs say ''The Voting Trustees had no right to take sides and to influence the beneficiaries how to vote, particularly when the extension would operate in favor of the Voting Trustees.'' The amendment did directly affect the personal interest of the trustees. Without it their services would have terminated within a few months. If the amendment should be adopted their tenure of

office would be extended more than 10 years beyond October 15, 1945. In recommending adoption of the amendment they acted in a dual capacity in which their undivided loyalty to the trust and their self-interest might conflict. Courts of equity do not permit trustees to put themselves in a position where it is difficult to be honest and faithful to their trust. *Galbraith v. Tracy,* 153 Ill. 54, 63. Or, as stated more fully in *Central Elevator Co. v. People ex rel. Moloney,* 174 Ill. 203, 207: "It is a firmly established rule that where one person occupies a relation in which he owes a duty to another he shall not place himself in any position which will expose him to the temptation of acting contrary to that duty or bring his interest in conflict with his duty. This rule applies to every person who stands in such a situation that he owes a duty to another, and courts of equity have never fettered themselves by defining particular relations to which, alone, it will be applied. They have applied it to agents, partners, guardians, executors, administrators, directors and managing officers of corporations, as well as to trustees, but have never fixed or defined its limits. The rule is founded upon the plain consideration that the one charged with duty shall act with regard to the discharge of that duty, and he will not be permitted to expose himself to temptation or be brought into a situation where his personal interests conflict with his duty. Courts of equity have never allowed a person occupying such a relation to undertake the service of two whose interests are in conflict, and then endeavor to see that he does not violate his duty, but forbid such a course of dealing irrespective of his good faith or bad faith."

The trust agreement requires a resolution of all the trustees as the first step in an amendment. Then if it is the opinion of the trustees that the amendment will materially affect the rights of holders of trust certificates, the trustees are required to notify the registered holders of all trust certificates "of the

nature of such amendment." No further obligation is imposed on the trustees, and no right or privilege of advocacy of the amendment is given them. In *Shapiro v. Chicago Title & Trust Co.*, 328 Ill. App. 650, the amendment did not affect the personal interests of the trustees, and the duty or right of the trust managers to make recommendations was not questioned. The attack on the communication sent to the beneficiaries of the trust related solely to its character. It was condemned by this court as being incomplete and misleading. In speaking of the duty of trust managers in notifying the beneficiaries, we said (p. 662): "Under Article 16, as defendants contend, the trust managers were merely required to send notice of the proposed amendment to the beneficiaries by mail, 'briefly specifying the nature of such proposed amendment.' However, the trust managers did more. They gave reasons supporting their recommendation that the proposed amendment was 'fair both to holders of preferred and common units alike.' In so doing they became advocates, urging the adoption of the amendment." In the instant case the substance of the communication sent by the trustees to the certificate holders is sufficiently stated above. It stresses the advantages seen by the trustees of continuation of their management over the possible dangers seen by the trustees if the voting trust were terminated as originally intended. The trustees, who were administering and directing the affairs of the corporation, say that they "sincerely believe that a continuation of the present administration of the affairs of your company will permit the uninterrupted carrying out of policies which have been adopted with a view towards the maximum realization by security holders upon their original investments," and that they "strongly recommend that the stock trust be extended for an additional period of ten years." There is nothing in the communication indicating when they were speaking as trustees, and when, as applicants for a job, they were promoting their own

interests. Having urged extension of their employ-
ment upon the certificate holders, respect for their
position and obligation as trustees should have
prompted them to facilitate communication between
the beneficiaries as to the amendment and to have
given ample time for such communication. Without an
emergency compelling prompt action—the notice hav-
ing been sent more than five months before the termi-
nation of the trust—and knowing that there were 750
beneficiaries, residing in 34 states, Washington, D. C.,
and Belgium, the trustees limited the time for dissents
to 20 days. When plaintiff Olson, who had filed her
dissent, spent 10 days—not an unreasonable time—in
consulting an attorney and determining upon a course
of action, requested a list of the certificate holders in
order that she might communicate with them for the
purpose of opposing continuation of the trust, the re-
quest was refused as "palpably made in bad faith,"
because "After waiting until May 12 to write to the
trustees, it is obvious that you have no sincere desire
to send a communication to the certificate holders in
opposition to the extension of the trust, to be consid-
ered by them within the 20-day period for dissents."
If the time was too short the defendants had made it
so, and thereby made marshalling the opposition to
their continued employment practically impossible.
However, in the short time remaining, communication
could have been had by telephone or letter with some
of the stockholders in Chicago and close by. The fact
that the trust agreement permitted the trustees to give
notice "not less than ten days prior to the date on
which it is proposed such amendment . . . is to
become effective," in no way diminished the trustees'
duty to act in utmost good faith in fixing the time
within which to file dissents. 54 Am. Jur., Trusts,
sec. 311.

The only other reason assigned by the trus-
tees for refusal of the list was their determination
"that such lists should not be furnished unless it ap-

pears that the purpose is legitimate and the interests of the majority shareholders will not be endangered." The vice of the latter position in the present case is that the trustees determined, against a trust benefici- ary and ostensibly for the majority beneficiaries, that the interest of the majority beneficiaries and the personal interest of the trustees in the extension of the trust are identical. Courts of equity do not permit trustees to make such decisions. *Central Elevator Co. v. People ex rel. Moloney, supra.*

 Defendants contend that plaintiffs cannot urge the refusal of the trustees to furnish the list of certificate holders because they failed to produce affirmative evidence of good faith on the trial, citing *Morris v. The Broadview, Inc.,* 385 Ill. 228. We are not dealing here with the right of a certificate holder under a statute to compel production of such list in a mandamus proceeding. The inquiry here is by a court of equity into the conduct of trustees who have circularized the trust beneficiaries strongly advocating an amendment extending the trust and their own employment as trustees for a period of 10 years, and who have denied the right of beneficiaries to communicate with the remaining beneficiaries in opposition to such amendment, to determine whether or not such conduct renders or contributes in rendering the purported approval of the amendment ineffective and void. At the time, defendants justified their refusal of the list on the ground of palpable bad faith, established by the delay of 10 days in forwarding the request for the list when only 20 days had been allowed by the trustees for filing dissents. The request for the list followed the improper conduct of the trustees in advocating the amendment which extended their employment 10 years in a letter to all certificate holders. The trustees had possession of and used the list of certificate holders in sending out their recommendation and notice. They sent it at the expense of the trust. Under such circumstances the right of a beneficiary to the list

would seem to follow as a matter of course, with the burden of establishing bad faith of a beneficiary as a bar to the right resting upon the trustees asserting it. If there were other facts and circumstances than those appearing from the pleadings and admitted documents showing alleged bad faith, the trustees should have produced them. Plaintiffs may have been foolishly optimistic in making the request, but there is nothing before us to justify the charge of palpable bad faith. It will not be presumed. It is not an answer to plaintiffs' claim to assert, as defendants do, that ''In effect the plaintiffs are demanding that all of the other certificate holders be denied the right to enter into a perfectly legal agreement, namely, that the duration of the trust be extended, even though such action is not coercive upon the plaintiffs.'' Plaintiffs became parties to the trust agreement which provided that it should terminate on October 15, 1945, whereupon, among other things, certificates for shares of stock would be issued to the stock trust certificate holders. They have the right to insist upon the terms of that agreement. Upon the dissolution of the trust, all parties to it will have the privilege of entering or abstaining from entering into a voting trust. A new voting trust requires affirmative action by each stockholder in entering into the agreement and depositing his stock, etc. Defendants, relying upon the inertia of the certificate holders and the favorable provisions of the trust agreement, which make non-action by the beneficiaries approval of the action of the trustees, seek to use the assets and facilities of the trust to retain their control of the stock of the passive beneficiaries and of the corporation by abusing their position as trustees and assuming a nonexistent authority to extend the life of the trust by amendment, and force dissident beneficiaries to withdraw and place themselves among the minority stockholders. They are not entitled to that advantage. Their illegal conduct should confer no benefit upon them. If all beneficiaries are freed from

the voting trust by its dissolution, the trustees will face a far more difficult task in forming a new trust, and plaintiffs and others may be in a better situation to organize a more favorable combination, or voting trust.

Plaintiffs' objection to the lease of the theatre in 1944 for 10 years, commencing in October 1945, is narrowed to the claim that the lease was executed without authority from the board of directors. There is no claim that the lease was in any way disadvantageous to the corporation or any certificate holder. It was executed by the proper corporate officers. The business of the corporation included the rental of the corporate premises, of which the theatre was only a part. There was no need for approval by the board of directors as the action of the officers was in the scope of their apparent authority and in the regular course of business. *Domestic Bldg. Ass'n v. Guadiano*, 195 Ill. 222, 226, 227. However, if authority were required, the amended answer of defendants alleges—and the allegation is not denied—that resolutions approving the lease were later adopted by the directors and entered of record. The complaint was properly dismissed as to the theatre company, and upon the record before us the lease is valid.

The decree dismissing the complaint for want of equity as to the defendants, the trustees and the corporation, is reversed and the cause remanded with directions to declare the amendment purporting to extend the voting trust beyond October 15, 1945 null and void; to dissolve the voting trust and to take such other and further action as shall be deemed necessary and advisable in conformity with this opinion. The order dismissing the amended complaint as to defendant Theatre Amusement Company is affirmed.

*Affirmed in part, and reversed and remanded with directions.*

O'CONNOR, P. J., and FEINBERG, J., concur.