Bessie Koenig and Gertrude Shapiro, Appellants, v. John J. Bickel, Jr. et al., Appellees.

Gen. No. 44,391.

Opinion filed May 10, 1949. Rehearing denied July 13, 1949. Released for publication July 18, 1949.

Shulman, Shulman & Abrams, of Chicago, for appellants; Meyer Abrams, of Chicago, of counsel.

FRIEDLUND, LEVIN & FRIEDLUND, of Chicago, for certain appellees; EMIL N. LEVIN, of Chicago, of counsel.

SEAGO, PIPIN, BRADLEY & VETTER, of Chicago, for certain other appellees; DONALD L. VETTER, of Chicago, of counsel.

MR. JUSTICE FRIEND delivered the opinion of the court.

Plaintiffs, as holders of ten units of interest in a trust, the *res* of which consists of 836 shares of the capital stock of Frances, Inc., a corporation, owner of an apartment building located at 5201–07 Woodlawn avenue in Chicago, filed their complaint in chancery to set aside a sale by John J. Bickel, Jr., W. G. Sturm and E. G. Sundin, the voting trustees, to Earl W. Johnson under a written agreement dated June 25, 1947. The chancellor who heard the cause entered a decree dismissing the suit for want of equity, from which plaintiffs appeal.

There is substantial agreement as to the salient facts. The trust agreement authorizes the trustees "to use and manage any property or assets which may be held at any time under the Trust, and any and every part thereof, in all respects as if such property or assets were the individual property or assets of the Trustees," and "without intending by specification to limit the above general grant of power," the trustees were authorized, *inter alia,* "to sell, exchange, or contract to sell or exchange, the Trust Property or any part thereof, except as herein otherwise specifically provided, for cash or for other property." The only limitation upon the foregoing power is as follows:

"The Trustees shall not sell or exchange the Capital Stock of New Company deposited hereunder nor vote such Capital Stock in favor of a sale by New Company of The Frances Apartments, if, upon prior notice in

24

writing thereof, which shall be given to the holders of all Participation Certificates then outstanding hereunder, the holders of Participation Certificates then outstanding hereunder evidencing one-third or more of the shares in the Trust shall, in writing filed with the Depositary, within twenty days after the date of the mailing of such notice, object thereto. Any holder of Participation Certificates who shall not, within the time and in the manner aforesaid, have objected to any such proposed sale, exchange or vote, shall be conclusively deemed to have consented to the same.''

Pursuant to the power and authority thus vested in them the defendant trustees, on June 25, 1947, entered into a written agreement with Earl W. Johnson, also a defendant in this proceeding, for the sale by them to Johnson of all the stock of defendant Frances, Inc., consisting of 836 shares, for which Johnson agreed to pay the sum of $26 net per share.

The contract contained a provision that if, within a period expiring at the end of 20 days following the submission of the terms of the said agreement by the trustees to their beneficiaries, any higher offers were submitted to the trustees, the purchaser should have until 5:00 p. m. of the day following the expiration of the said 20-day period to agree in writing to meet any such higher offer or offers; that in the event said defendant Earl W. Johnson did not meet any such higher offers, the defendant trustees had the right to enter into a contract for sale to such higher offerers and that upon the execution of any such new sales agreement the said contract of June 25, 1947 would become null and void. It further provided that if on submission of the contract to the beneficiaries of the trust the holders of participation certificates representing one-third or more of the shares of defendant Frances, Inc., dissented from the proposed sale, the contract would be null and void.

There was the further provision that in the event holders of participation certificates representing over two-thirds of the shares of said corporation did not dissent and if the defendant Earl W. Johnson did agree in writing to meet any higher offer or offers within the time provided, the trustees would then consummate the contract by the sale of the shares of Frances, Inc., to the defendant Earl W. Johnson.

It appears that on June 28, 1947, the trustees sent notice to all the beneficiaries of the trust wherein the salient provisions of the contract entered into between them and Johnson were fully set forth. The shareholders were notified that Johnson had agreed to purchase all the stock for the sum of $26 per share; that he was to pay all expenses and broker's commission in connection with the sale, so that if consummated the holders of participation certificates would receive $26 for each share in the trust; that the trustees were authorized, within 20 days from the date of the notice, to receive higher offers for the shares of the corporation which might, at the option of Johnson, be met by him; and that in the event Johnson did not meet such higher offer, the shares would be sold to the person making them within the 20-day period. They were further advised that as of February 25, 1947, the property was appraised by Arthur Kruggel, an independent appraiser and member of the Appraisal Institute, as having a fair cash market value of land and improvements thereon of $67,500, and that a copy of the appraisal and of the agreement with Johnson could be examined by any interested party during business hours at the trustees' office, 39 South La Salle street. The notice gave a detailed description of the improvements on the property, stated that a reserve of $4,000 had been created for refrigerator replacement, and described the character of the neighborhood in which the building was located, giving shopping centers,

schools, churches and transportation facilities. Attached to the notice was a condensed balance sheet of the corporation as of May 31, 1947, as well as a profit and loss statement on the accrual basis for the year ended May 31, 1947, both prepared by certified public accountants. The notice set out the expenses of sale, deductions and the total cost, exclusive of possible income taxes, amounting to $59,729.56, and stated that although the proposed purchaser was not the holder of any participation certificates, the trustees had been informed that interests affiliated with him owned or controlled approximately 40 per cent of the outstanding shares in the trust; that in the event of sale all existing agreements for fiscal agency services and management would be canceled, and the then officers and directors would resign. The certificate holders were told that the buyer had deposited the sum of $2,000 as earnest money, and that the balance of the purchase price was to be paid upon the seller's compliance with the terms of the agreement. They were advised that in the opinion of the trustees the sale was "for the best interests of the certificate holders and should be made." The facts stated in the notice are not disputed; there is no evidence to the contrary, and John J. Bickel, Jr., one of the trustees, testified that the facts and figures contained in the notice were correct, and that the notice contained the pertinent facts relative to the sale.

After the notice was mailed to the certificate holders and during the 20-day period specified in the contract, the trustees received three additional offers, one for $29 per share, another for $38 per share, and a final offer for $40 per share. The effect of the increased offer from $26 to $40 per share was to enhance the sale price for the building, which was the real asset of the trust, from $67,500 to $78,000, or an increase of approximately 15 per cent. The evidence discloses that holders of 25 units of participation in said trust fund,

out of a total of 836 units, filed their dissents with the trustees within the 20-day period, as provided in the notice, and that no dissent by any other beneficiaries had been indicated, except that by plaintiffs as owners of 10 units of beneficial interest which they had acquired by purchase during the year 1946.

On the last day of the 20-day period plaintiffs lodged their complaint herein, and about one o'clock of that day delivered a copy to the trustees. They stated in their complaint that they had no objection to the sale, but desired a judicial sale conducted by the court, and alleged that ''they have procured a purchaser who is willing to guarantee a bid of $30 per share.'' Inasmuch as the third additional offer received by the trustees within the 20-day period amounted to $40 per share, the foregoing allegation in the complaint constituted an offer to purchase the shares at $10 a share less than the best offer obtained by the trustees. Plaintiffs evidently became aware of this circumstance, and accordingly, in the amendment to their complaint filed October 14, 1947, long after the expiration of the 20-day period, they stated that the party who was alleged to have offered to pay $30 a share, had some time subsequent to September 31 decided to increase his offer to $50 per share.

Although plaintiffs charge the trustees with fraud, bad faith and various wrongful acts, their counsel advised the court upon hearing that they were not charging the trustees with any wrong-doing as individuals nor raising any issue as to fees and services, and the chancellor found that the contract entered into between them and Johnson ''was fair and equitable and that the defendant Trustees herein have fairly and properly exercised their discretion under the trust agreement''; that no substantial evidence was offered on the trial to support the charges that the trustees had been guilty of other wrongful acts, and he found from the evidence that they had acted in good faith.

The rule is well established in this State that where trustees, in the exercise of their discretionary powers, honestly and reasonably enter into business engagements, courts of equity have no right to interfere. This doctrine of the limitation on the court's exercise of its powers over trustees has been repeatedly stated. *Continental Illinois Nat. Bank & Trust Co. of Chicago v. Sever,* 393 Ill. 81; *Altschuler v. Chicago City Bank & Trust Co.,* 380 Ill. 137; *Martin v. McCune,* 318 Ill. 585; *Fischer v. Butz,* 224 Ill. 379; *Asher v. Teter,* 314 Ill. App. 200 (Abst.); and *Story v. Palmer,* 46 N. J. Eq. 1. Having been vested with broad discretionary powers, including the power of sale, the trustees in the instant proceeding had the right to enter into a sales agreement with Johnson, and in the absence of proof of fraud, bad faith or abuse of discretion, neither the chancellor nor this court on review would be justified in interfering with the exercise of such powers within the provisions of the trust instrument. In performing their duty and exercising their discretion to enter into a contract for the sale of the property, the trustees fully and fairly complied with the provisions of the trust agreement by notifying the beneficial holders of the salient provisions of the contract and giving them all other available information which would enable the beneficiaries to decide, on the basis of all pertinent information, whether to assent or dissent. After the notice was mailed and higher offers were made, Johnson was notified of the increased bids, and by an instrument in writing, within the time and in the manner specified in the sales contract, he agreed to meet the highest bid. When this was done all conditions of the contract were complied with; it became a final sale, binding upon both the buyer and the seller. *Gumbiner v. Alden Inn, Inc.,* 389 Ill. 273.

Plaintiffs assert and would have us find that there was no binding agreement between the trustees and the purchaser by reason of the following provision

contained in the last sentence of paragraph 11: "In the event that Sellers shall fail to or be unable to perform the terms and conditions of this agreement on their part to be kept and performed, in the time and manner herein specified, then the earnest money shall be returned to Purchaser and this agreement shall become null and void, without any liability on the part of the Sellers whatsoever." Plaintiffs say that when they offered to guarantee $50 a share, it was the duty of the trustees not to accept Johnson's bid in the amount of $40 per share, and to require a minimum bid of $50. It will be recalled, however, that the $50 offer was not made until long after the expiration of the 20-day period and over three months after the notice of sale was mailed to the beneficiaries. If the contract was entered into fairly and in good faith, as the chancellor found and as we believe, the trustees would not have been justified in terminating the agreement with Johnson after all the terms had been fully complied with by him and the sale consummated. At that point it became binding upon both the buyer and the seller. *Gumbiner v. Alden Inn, Inc., supra.*

Another charge leveled at the trustees is that they placed themselves in an adverse position and profited from the sale. Quite to the contrary, the sale was a financial loss to the trustees. Their self-interest dictated no sale, for if no sale were made they could have continued as trustees; and in the event of a sale they were entitled to compensation for services rendered in winding up the trust regardless who the purchaser was, and their fees would not be affected thereby.

Plaintiffs further contend that the trustees were guilty of bad faith because of "sales talk." This contention is predicated upon the statement in their notice to the beneficiaries that the sale was "for the best interests of the certificate holders and should be made." They cite *Shapiro v. Chicago Title &*

*Trust Co.,* 328 Ill. App. 650, and *Olson v. Rossetter,* 330 Ill. App. 304, as holding that an attempt to influence the beneficiaries not to dissent to the sale was fraudulent on its face. Neither of these cases so holds. In the *Shapiro* case the present counsel for plaintiffs contended that the assent of the unit holders was ineffective because of misstatement and omissions in the letter of the trust managers to the unit holders recommending an amendment as fair and equitable. The court there held that under the applicable provision of the trust instrument the trust managers were merely required to send notice of the proposed amendment to the beneficiaries by mail ''briefly specifying the nature of such proposed amendment,'' and said that ''the trust managers did more. They gave reasons supporting their recommendation'' and ''in so doing they became advocates, urging the adoption of the amendment. It thereupon became their duty to disclose fully and fairly to the unit holders—and particularly to the holders of preferred units—all facts upon which such holders were required to exercise judgment in determining whether to approve or oppose the amendment. [Citing cases.] The communication from the trust managers omitted all reference to Article 2, which, as admitted by counsel for defendants on oral argument, at least when standing alone, gave the trust · managers full power to sell all the trust property at any time, upon terms and conditions agreeable to them. We have been referred to no provision of the trust agreement limiting or restricting this power, and our examination discloses none.'' An examination of this decision discloses that the trustees were criticized, not because they made a recommendation, but because they failed to give the beneficiaries adequate and complete information. The same conclusion was reached in *Olson v. Rossetter, supra.* In that case the present counsel for plaintiffs also represented the protesting parties, and contended that ''the voting trustees had

no right to take sides and to influence the beneficiaries how to vote, particularly when the extension would operate in favor of the Voting Trustees.'' The court held with his clients in that proceeding, saying that ''The amendment did directly affect the personal interest of the trustees. Without it their services would have terminated within a few months. If the amendment should be adopted their tenure of office would be extended more than 10 years beyond October 15, 1945. In recommending adoption of the amendment they acted in a dual capacity in which their undivided loyalty to the trust and their self-interest might conflict. Courts of equity do not permit trustees to put themselves in a position where it is difficult to be honest and faithful to their trust.'' It was because of the circumstances of that case that the court held it a violation of their duty by the trustees to take sides and influence the beneficiaries how to vote. In the case at bar the trustees could in no wise be benefited by the sale, and their recommendation was accompanied by a lengthy detailed statement which gave the beneficiaries all the available facts. We fail to perceive anything improper or misleading in their recommendation.

It is further urged by plaintiffs that the contract price of $26 per share was inadequate at the time the agreement was made. They say that the trustees, being experienced realtors, knew the value of the property, and therefore should have been aware that the price was grossly inadequate. As already stated, the trustees secured an appraisal of the property by a highly qualified appraiser. They computed its market value to be $67,500. If the real estate were sold for its appraised price, this was approximately the original contract price for the shares. Plaintiffs made no effort to prove any different value of the property other than the one accepted by the trustees, but rely solely on the subsequently increased offers to support their argument that the price was inadequate. This contention

is refuted by their own conduct. Twenty days after the initial bid was made, plaintiffs in their complaint offered to secure a bid of $30 per share. This offer was made by Harry D. Koenig; one of the plaintiffs was his wife, the other, his stenographer. Each of them held five shares. He testified that he then considered his offer of $30 "as fair as compared with the $26.50 offered." The contract with Johnson provided for higher offers, and the fact remains that $40 per share was ultimately obtained.

■ . Lastly, plaintiffs' principal attack before the chancellor. and on appeal was against the contract itself because of the provision permitting the purchaser to meet later bids. Counsel says that the right to meet a higher bid without the reciprocal right of other bidders to compete with him tended to chill bidding and to stifle competition and was against public policy. No case is cited in which the courts have disapproved the action of trustees in entering into a contract with this or similar provisions. On the contrary, in *Asher v. Teter, supra,* we approved an identical provision with the following comment: "As to the provision in the contract of sale giving Melmed, the purchaser, the right or option to match any higher offer made for the property, we think that under all the circumstances said provision was entirely fair and equitable"; and in *Gumbiner v. Alden Inn, Inc., supra,* the court refused to set aside a contract containing a similar provision. The fact remains that in this instance the contract did not chill the bidding, because three other bids were received within the 20-day period raising the sales price from $26 to $40 per share.

As heretofore stated, the holders of only 25 shares objected to Johnson's original offer, and plaintiffs themselves offered $30 per share within the 20-day period, which was $10 less than the sales price. Plaintiffs now seek to circumvent the trust and sales agreement by having the trustees blandly inform the pur-

chaser that they have decided to repudiate the contract, have the court take the property away from the trustees, set aside the stock trust agreement, rescind all contracts, and dispose of the trust property at a judicial auction sale; and if successful, they would no doubt apply to the court for allowance of reasonable expenses and attorneys' fees in conformance with one of the prayers of the complaint. Under the circumstances of this case it would have been manifestly improper for the chancellor to direct this course of action.

The decree of the circuit court is affirmed.

*Decree affirmed.*

SULLIVAN, P. J., and SCANLAN, J., concur.