**Frederick Gerald Thomas, Appellant, v. 4145 Broadway Hotel Company et al., Appellees.**

**Gen. No. 45,056.**

Opinion filed November 29, 1950. Rehearing denied December 20, 1950. Released for publication February 23, 1951.

LLOYD C. WHITMAN, of Chicago, for appellant.

SONNENSCHEIN, BERKSON, LAUTMANN, LEVINSON & MORSE, of Chicago, for appellees; ISAAC E. FERGUSON, of Chicago, of counsel.

MR. JUSTICE BURKE delivered the opinion of the court.

On May 16, 1947, Frederick Gerald Thomas, as holder of stock certificates Nos. 8, 15, 16 and 18 for 29 shares of 4145 Broadway Hotel Company, a corporation, also as holder of a trust participating certificate for 5 shares, a total of 34 out of the 11,910 shares of the corporation, filed a complaint in chancery in the superior court of Cook county "for himself and for any parties in interest similarly situated who desire and may properly join herein as coplaintiffs in prosecution of this suit," against 4145 Broadway Hotel Company, George W. Rossetter, Maurice A. Rosenthal and Jay C. McCord. At the time the suit was filed there was in existence a voting trust with respect to the stock of the hotel company created by agreement dated May 1, 1935, as part of the plan of reorganization of the hotel company confirmed by the United

310

States District Court on May 7, 1935. The basis of plaintiff's complaint was that the stock trust agreement had been improperly extended by amendment for a period beyond May 1, 1945, the original date of termination. The amendment extending the duration of the trust was adopted by the stock trustees on November 2, 1944, subject to rejection by dissents of the beneficial owners of 33 1/3 per cent or more of the shares of stock held in the trust. Only two dissents were filed, on 1.34 per cent of the trust shares, whereupon the extension of the trust agreement was declared effective. Rossetter, Rosenthal and McCord were trustees under the trust agreement of May 1, 1935. During the pendency of the suit McCord died and the Northern Trust Company, as executor, was substituted for him. Among other relief plaintiff prayed that the attempted extension for 10 years be decreed null and void; that the trust be decreed to have terminated as of May 1, 1945; that the individual defendants account for all moneys and property at any time received, paid out or disposed of by them or any other parties for them, from, for, out of or for the use, benefit or account of the trust estate; and for general relief. The case was heard by the chancellor, who entered a decree dismissing the complaint for want of equity. Subsequently, the chancellor denied plaintiff's petition and motions to vacate and modify the decree. Plaintiff, appealing, asks that the decree and the order overruling his motion to vacate the decree be reversed and that the cause be remanded with directions that a decree be entered finding that the trust terminated as of May 1, 1945, that the former trustees ceased to be trustees as of that date, and directing that an accounting be had.

Plaintiff's theory of the case is that the trust terminated as of May 1, 1945; that the individuals ceased to be trustees, directors, officers, stockholders or agents

of the corporation on that date, though before the trust ended they had in terms been elected or hired "this or that" beyond May 1, 1945; and that the trust having ended it is up to the "ex-trustees and all ilk are properly called upon to account to 4145 Broadway Hotel Company." Defendants' theory of the case is that regardless of any questions of rights and obligations as between the stock trustees and the plaintiff as holder of a trust participating certificate, the acts of the stock trustees as record holders of shares of stock of the corporation until March 10, 1948, also the acts of the stock trustees as directors of the corporation until April 14, 1948, performed in conformity with the applicable corporation laws of the State, were binding upon the corporation, its shareholders and all persons dealing with it; that all holders of trust participating certificates acquiesced in the continued existence of the stock voting trust from May 1, 1945 to February 11, 1948, and accepted the benefits thereof; that therefore they are debarred from claiming that the extension of the trust beyond May 1, 1945 was invalid; that when the case came to trial in April 1949, the stock trust was no longer in existence, that the shares of stock formerly held by the stock trustees had been transferred to the holders of trust participating certificates; that consequently no decree was needed to bring the trust to an end; that plaintiff failed to show that he had any right to a recovery of damages or other legal or equitable relief, dependent upon an adjudication by the court of the validity or invalidity of the amendment extending the duration of the stock trust agreement beyond May 1, 1945; and that therefore the question of the validity of the amendment was moot.

The corporate defendant, 4145 Broadway Hotel Company, was reorganized pursuant to a decree of the United States District Court entered May 7, 1935. The plan of reorganization confirmed by the district court

called for a stock voting trust agreement covering all of the shares of the company to be issued pursuant to the plan. The stock trust agreement dated May 1, 1935, was approved by the court. The parties to this agreement were the corporation, the persons entitled to receive shares of the corporation and the persons designated to serve as stock trustees, namely, George W. Rossetter, Jay C. McCord and Paul Steinbrecher. Upon the death of Paul Steinbrecher, Maurice A. Rosenthal was appointed as successor trustee. The number of shares of stock issued pursuant to the plan of reorganization was 11,910. Stock certificates for the shares were issued to the trustees, who issued trust certificates to the persons entitled to the beneficial interest in the shares. Under the terms of the trust agreement any holder of a trust certificate had the right at any time to surrender such certificate and receive in lieu thereof a stock certificate. In the ten-year period until May 1, 1945 only 37 shares were withdrawn from the trust. The trust agreement further provided that a referendum vote of the certificate holders be taken every two years to determine whether the trust should then be ended. Such referenda were held in 1937, 1939, 1941 and 1943.

The trust agreement provided that the trust should terminate on May 1, 1945, unless sooner terminated in one of the ways provided for earlier termination. The agreement also contained a general power of amendment pursuant to which the trustees and certificate holders adopted an amendment extending the duration of the trust agreement for a further period of ten years from May 1, 1945, subject to earlier termination by action of the trustees or of the certificate holders as provided in the agreement. The termination and amendment provisions in the stock trust agreement were essentially the same as the corresponding provisions in the Embassy Hotel stock trust agreement, con-

313

sidered in *Russ v. Blair;* also the same as the corresponding provisions in the 1617 Belmont Company stock agreement involved in *Olson v. Rossetter.* In *Russ v. Blair* a decree was entered in the superior court on January 30, 1946, upholding the validity of an amendment extending the duration of the stock trust agreement. A like decree was entered in *Olson v. Rossetter* on June 6, 1946 in the circuit court. On February 3, 1947, the first division of this court reversed the decree in *Olson v. Rossetter* with respect to the validity of the amendment extending the duration of the stock trust (330 Ill. App. 304). On February 26, 1947, the third division of this court affirmed the decree in *Russ v. Blair* (330 Ill. App. 571). Leave to appeal was granted by the Supreme Court in both cases. In the Supreme Court the cases were consolidated for opinion. On January 22, 1948, the Supreme Court rendered an opinion to the effect that the duration of a stock trust agreement with termination and amendment provisions such as those in the 4145 Broadway Hotel Company stock trust agreement could not be extended by the process of amendment (399 Ill. 232). On February 11, 1948, the trustees under the 4145 Broadway Hotel Company stock trust agreement adopted a resolution forthwith terminating the trust and directing the agent and depositary of the trustees to deliver stock certificates to the record holders of trust participating certificates for the number of shares called for by their respective participating certificates.

The case did not come to trial until April 28, 1949. Meanwhile, the stock voting trust agreement was terminated on February 11, 1948, by resolution of the trustees. On March 10, 1948, the 11,798 shares of the corporation then held by the stock trustees were transferred of record to the persons who then held trust participating certificates. On March 19, 1948, notice was given to all of the shareholders then of record that

314

the annual meeting of the shareholders of the company would be held on April 14, 1948, (1) to elect a board of directors, (2) to ratify and confirm all actions of the board of directors and officers of the company since the last annual meeting of shareholders, and (3) to transact such other business as might properly come before the meeting. At the shareholders' meeting held on April 14, 1948, all actions taken by the officers and directors since the last annual meeting were ratified, approved and confirmed and a new board of directors was elected, namely, Benjamin B. Morris, Edward S. Flynn and Maurice A. Rosenthal. Thus, for more than a year prior to the trial of the case the former stock trustees had ceased to have any official connection with the corporation, except that Mr. Rosenthal had been elected as a director by the shareholders present and represented by proxies at the meeting of April 14, 1948. No other holder of stock certificates or trust certificates for shares of the corporation joined plaintiff in the prosecution of his suit or complained of the existence of the stock voting trust from May 1, 1945 to February 11, 1948.

At the time plaintiff commenced his suit on May 16, 1947, he was the owner of four stock certificates of the corporation representing 29 shares and one trust participating certificate for five shares. The minutes of the shareholders meeting held on April 14, 1948, show that plaintiff was then the record holder of 95 shares. At the trial he testified that he owned 95 or 100 shares of the corporation. It thus appears that plaintiff continued to acquire shares after instituting his suit on May 16, 1947. Plaintiff procured issuance to himself of a trust certificate for 30 shares on February 6, 1948, more than 33 months after the extended term of the stock trust began. During the last half of 1945, the years 1946 and 1947 and the first half of 1948, plaintiff received dividends on trust certificates aggregating

315

$281.75 and dividends on stock certificates aggregating $339. Later in 1948, plaintiff received additional dividends of $150, making a total for the period from May 1, 1945, until the end of the year 1948 of $770.75.

 We agree with defendants that plaintiff represented no one but himself and that the suit is not a "class" or "representative" suit. The fact that plaintiff calls it a "representative" or "class" suit does not make it so. The common interest and identity of position ceased to exist when the shareholders were called upon to take action with respect to the proposed extension of the stock trust, and only the plaintiff and one other certificate holder chose to dissent from the extension amendment. No share owner could be heard to complain of the extension of the trust beyond May 1, 1945, if such extension was due in part to his own acts, nor if, with knowledge that the extension amendment had been declared effective, he acquiesced therein and took the benefits thereof. Plaintiff's position was unique in that he was the only share owner who in any manner questioned the validity of the amendment extending the term of the voting trust agreement. The continued existence of the voting trust from May 1, 1945 to February 11, 1948, was satisfactory to all persons beneficially interested in the shares of the company except the plaintiff. At the time of the trial and decree there existed no community of interest between plaintiff and the other shareholders or any class of shareholders, and there was no question of fact or law in which the plaintiff and other shareholders had a common interest and in relation to which plaintiff and the other shareholders occupied the same or a similar position. Plaintiff's claim for an accounting was not in its nature common to all of the shareholders, nor a claim in respect to which the shareholders all stood in the same position. Whether a shareholder could maintain a claim for an accounting

against the trustees for alleged wrongful expenditures of corporate funds was dependent upon the time, manner and circumstances of his acquisition of the shares. It was also dependent upon the acts done or omitted by the share owner, from which it could be determined whether the shareholder was precluded from asserting such claim by consent, acquiescence, waiver, laches or other ground of equitable estoppel.

██ We further find that plaintiff is estopped by laches, acquiescence and acceptance of the benefits of the continued existence of the stock trust after May 1, 1945. The extension amendment was declared effective December 28, 1944. Yet plaintiff waited until May 16, 1947 to institute his suit challenging the validity of the amendment. Meanwhile, plaintiff was present at the annual meeting of the shareholders held on April 11, 1945, when the trustees re-elected themselves as directors of the corporation for a further term of one year; also at the annual meeting of shareholders held in 1946 and 1947, at which time like action was taken; also at the several special meetings of shareholders held during this same period when the trustees voted for payment of liquidating dividends. Thus he knew that the trustees were continuing to vote 99 per cent of the shares of the company as the record owners thereof, serving as the directors and principal officers of the company, and receiving compensation. Meanwhile, plaintiff accepted the benefits of the substantial liquidating dividends declared by the trustees and confirmed by their votes of 99 per cent of the shares of the corporation. Plaintiff knew that the liquidating dividends required confirmatory vote of the record holders of 66 2/3 per cent of the outstanding shares of the corporation; that the continued existence of the stock trust facilitated such vote; that otherwise there would have been the difficulty and expense of attempting to obtain attendance at the special dividend meet-

ings of the requisite number of shareholders, in person or by proxy, at a time when there were approximately 875 share owners residing in 41 different states and a few outside the United States. Furthermore, if the trustees had not continued to serve as the directors and principal officers of the company, such services would have cost the company substantially more than the compensation paid to the trustees. Since plaintiff made no complaint of the quality of the services rendered by the trustees, he gave tacit recognition to the fact that these services contributed materially to the earnings which made possible the payment of dividends.

■ When the case came to trial on April 28, 1949, no aid of the court was needed to terminate the stock voting trust, nor to procure transfer of the trust shares to the beneficiaries. More than a year previously the trust had gone out of existence. All shares formerly held by the stock trustees had been transferred of record to the beneficiaries. By these events the question of the validity of the amendment extending the duration of the trust had been rendered moot unless the plaintiff could show that an adjudication of this question was a necessary prerequisite to other relief to which he might be entitled.

■■ We agree with defendants that the corporate acts done after May 1, 1945, were not involved. The trustees remained the legal owners of over 99 per cent of the shares of the corporation until March 10, 1948, by the express provisions of the trust certificates, regardless of the invalidity of the amendment extending the duration of the trust agreement. Each certificate provided that "until the trustees shall have delivered the stock held by them under said trust agreement to the holders of the participating certificates, or to an agent or to the corporation as specified in said agreement, the trustees, or their successors in trust, shall

possess and shall be entitled to exercise all rights and powers of every nature of absolute owners of said stock, including the right to vote thereon for every purpose and to exercise consents in respect thereof for every purpose except as otherwise expressly provided in said trust agreement, it being expressly stipulated that no voting right passes to the owner hereof, or his assigns, by or under this certificate, or by or under any agreement expressed or implied.'' By the express provisions of the trust certificates and the trust agreement the trustees retained the right to vote the trust shares so long as they remained the record holders thereof, notwithstanding the termination of the trust. The trustees remained the record holders of 99 per cent of the shares until March 10, 1948. Section 32 of the Illinois Corporation Act [Ill. Rev. Stat. 1949, ch. 32, par. 157.32; Jones Ill. Stats. Ann. 32.032] provides that the original share ledger or transfer book, or a duplicate thereof kept in this State, shall be prima facie evidence as to who are the shareholders entitled to examine such list or share ledger or transfer book, or to vote at any meeting of shareholders. The trustees divested themselves of voting rights on March 10, 1948, by then transferring of record to the holders of trust certificates all of the shares theretofore held by the trustees. Furthermore, the trustees continued to vote the shares after May 1, 1945, with the acquiescence of the beneficiaries (including the plaintiff, to the extent that he voluntarily permitted the trustees to vote shares for which he held trust certificates, instead of withdrawing the shares from the trust as he could have done at any time). Plaintiff cannot complain that the beneficiaries of the trust shares should not have acquiesced in the continued voting of the trust shares by the trustees. Such complaint would have to be made by each beneficiary for himself. It was entirely lawful for the

319

owners of the trust shares, if they so desired, to permit the trustees to continue to remain the registered holders of the trust shares, and to continue to exercise the voting rights incident to such registration. The arrangement was at all times purely voluntary.

We are of the opinion that on plaintiff's claim for an accounting by the trustees for unlawful expenditure of corporate funds there was a total lack of proof. The corporation owns and operates the hotel and store building at Broadway and Buena, Chicago, containing 338 rooms and 13 stores. In the 1945–1948 period, in addition to the normal matters of administration, several special problems demanded the attention of the directors. Throughout this period the stock trustees served as directors and principal officers. Repairs and rehabilitation had been restricted during the war period, consequently a great deal of time had been devoted to the formulation of a large scale program of rehabilitation. The outstanding mortgage on the property carried an interest rate of $4\frac{1}{2}$ per cent per annum and called for specified prepayments. The directors succeeded in obtaining a reduction of one per cent per annum on the rate of interest, also a reduction of the prepayments. The directors undertook a general reappraisal of the value of the property for insurance purposes and this study resulted in extensive changes in amounts and types of insurance carried. Special income tax problems arose. The directors held meetings on the average of twice a week and conferred with each other frequently by telephone regarding various matters under consideration.

Mr. Rosenthal, one of the trustees, who had served as a director of similar corporations for many years and was familiar with the customary fees charged by fiduciaries in Chicago for services such as those rendered by the directors, testified that the fair, reasonable, usual and customary charge for such services was

320

between 1½ per cent and 2 per cent of gross receipts, as compared with the compensation at the rate of 1 per cent paid to the stock trustees and directors. For the three-year period covering the last half of 1945, the years 1946 and 1947 and the first half of 1948, gross rental receipts aggregated $596,879.85. After depreciation provision of $47,933.49, the net profit for the period amounted to $110,474.17. The aggregate compensation received by each of the three stock trustees subsequent to May 1, 1945, was $1,733.22. No compensation was received for any period after December 31, 1947, although the trustees continued to serve as directors until the new board was elected on April 14, 1948.

Plaintiff calls attention to payments during the period after May 1, 1945, of attorney fees, depositary fees, certificates of indebtedness, also a payment to the United States government of $7,000 "for overcharging rents." There is no evidence that any of these payments arose out of the continued existence of the stock voting trust after May 1, 1945, or that such payments could have been avoided or reduced in amount if the stock trust had ended May 1, 1945. The record does not show that the $7,000 paid to the United States government was caused by malfeasance of the defendants. A dispute arose regarding the number of rooms in the hotel which could properly be registered for rent control purposes as transient rooms, rentable on a daily rate basis rather than on a weekly or monthly basis. This dispute resulted from the practice of the hotel in pre-war years of giving certain guests the benefit of weekly rates in order to obtain their patronage, although the occupancy was on a day-to-day basis. If the rooms in question had been improperly registered as rooms rentable on a daily basis, as contended by the government, the company would have been subject to very large penalties. Rather than risk

the outcome of the threatened litigation, the attorneys for the company negotiated a settlement of the government's claim for $7,000, but at the same time obtained an agreement that a substantial number of rooms would continue to be registered and rented on a daily rate basis. The net result was advantageous to the company since room occupancy was then running at a rate close to 100 per cent.

We are satisfied that the chancellor was right in dismissing the complaint for want of equity. Therefore, the decree of the superior court of Cook county is affirmed.

*Decree affirmed.*

KILEY and LEWE, JJ., concur.