(No. 27985.—

FREEMAN COAL MINING CORPORATION *et al.,* Appellees, *vs.*
FRED A. BURTON *et al.,* Appellants.

*Opinion filed Nov. 22, 1944—Rehearing denied Jan. 15, 1945.*

JOHN J. DOWDLE, (CHARLES H. BORDEN, of counsel,) both of Chicago, for appellants.

HENRY S. BLUM, of Chicago, for appellees.

Mr. JUSTICE WILSON delivered the opinion of the court:

Plaintiffs, Freeman Coal Mining Corporation, William J. Krugly, and Material Service Corporation, filed their amended complaint in the circuit court of Cook county against the defendants, Fred A. Burton, Marjorie Hair Burton, his wife, and Chicago, Wilmington and Franklin Coal Company, seeking to have Fred A. Burton and his wife, the title holders, declared trustees of certain coal lands, located in Williamson county, for the use of the Burton Coal Company and to have plaintiffs declared successors in interest to the Burton Coal Company. Chicago, Wilmington and Franklin Coal Company was later dismissed as a defendant. The amended complaint alleged, in substance, that Fred A. Burton, at a time when he was president of the Burton Coal Company, unlawfully diverted its corporate funds, in fraud of the rights of the corporation, its creditors and shareholders, for the purpose of purchasing, in the name of his wife and himself, the real estate in controversy; that proceedings were subsequently instituted in the district court of the United States for the northern district of Illinois, eastern division, for the reorganization of the corporation and its two wholly-owned subsidiaries; that J. Roy Browning was appointed as trustee, and took possession of the assets and properties of the three debtor corporations, and that, under the provisions of a proposal for reorganization, approved by the court, the Freeman Coal Mining Corporation, one of the plaintiffs here, became grantee of all the estates and properties of the debtor corporations, together with all rights which the trustee may have asserted against any person by reason of any property held by such person in trust for the corporate debtors, or which he, as trustee, might have asserted as to the properties conveyed or transferred in fraud of the creditors of the Burton Coal Company, or properties in possession of some third person for which he, as trustee, may have sued for possession. The amended complaint

further alleged that Browning, as trustee, without full knowledge of the facts, paid to Burton large amounts of money as royalties for coal mined on the lands upon representations made to him by Burton that he, Burton, was the legal owner of the property, and that plaintiff Freeman Coal Mining Corporation, succeeding to the rights of the trustee, continued to mine the coal on the property described. Defendants, by their answer, admitted the purchase of the real estate in controversy; that Burton was president of the Burton Coal Company; the filing, in 1938, of a petition for reorganization of the Burton Coal Company and its two subsidiaries, and, in substance, denied all the remaining allegations of the amended complaint. The master in chancery, to whom the cause was referred, found the issues in favor of plaintiffs. The chancellor overruled defendants' exceptions to the master's report and entered a decree declaring that the conveyance was in fraud of the rights of the Burton Coal Company, its shareholders and creditors, and that the plaintiff Freeman Coal Mining Corporation be deemed to have succeeded to the rights and interests of the Burton Coal Company, its shareholders and creditors. The decree ordered and directed, among other things, that defendants, Fred A. Burton and Marjorie Hair Burton, his wife, (1) convey to Freeman Coal Mining Corporation all their right in and to the property, whether held by them in fee or as lessees, and, (2) account to the Freeman Coal Mining Corporation for all moneys, income, royalties, profits and other benefits previously received by them or in their possession or control. From this decree, the defendants prosecute an appeal directly to this court, a freehold being necessarily involved.

There is no substantial dispute as to the material facts. The real estate in controversy was owned by the Chicago, Wilmington and Franklin Mining Company, a subsidiary of the Chicago, Wilmington and Franklin Coal Company, previously dismissed as a defendant. The latter company,

in 1936, succeeded to all the rights of the former company, which was dissolved. In 1931, the former company contracted for the sale of the property to Burton. This contract was not introduced in evidence. On March 5, 1935, the Chicago, Wilmington and Franklin Mining Company and Fred A. Burton and Marjorie Hair Burton entered into a new agreement for the sale of the lands, in which is recited a previous payment of the sum of $5526.71, credit for which is allowed on the new sale price of $45,526.71. The contract also recites receipt by the seller of $1200 on the day of signing, and provides for payment of the balance of $38,800 in four installments, the last of which was to mature on or before March 1, 1937. The evidence discloses that, on December 15, 1936, a voluntary reduction of $10,000 from the sale price specified in the contract was granted by the seller, owing to depreciation in value of the coal lands subsequent to the execution of the contract, and that, with the exception of the sum of $5526.71 already paid in 1931, and the payment of $1200 on March 5, 1935, the date of the new contract, payment of the entire balance of $28,800, remaining due according to the terms of the contract, was made by using seven checks of the Burton Coal Company issued in varying amounts, during the period from October 24, 1936, to April 27, 1937.

The evidence further discloses that, on March 5, 1935, and during the entire period thereafter, the Freeman Coal Mining Company had its trackage and equipment located upon the property in controversy in position to mine coal. This equipment included ties, wires, pit cars and cutting equipment. By reason of its location and because of the cost of sinking a new shaft, if the mining were undertaken by any other company, when considered with respect to the amount of coal remaining to be mined, the Freeman Coal Mining Company, at the time of the purchase, was in an advantageous economic position to mine the land.

The cost of sinking a new shaft for the mining of this land was estimated at $500,000. Burton, at the time of these payments and prior thereto, was heavily in debt to the Continental Illinois National Bank and Trust Company of Chicago in an amount exceeding $100,000. Marjorie Hair Burton was a housewife, dependent upon her husband for support. On March 5, 1935, the Burton Coal Company and its subsidiary, the Freeman Coal Mining Company, were also heavily indebted to the same bank. This depressed financial condition of the Burton Coal Company and the Freeman Coal Mining Company continued and culminated in proceedings to reorganize, instituted in September, 1938. When the checks were drawn, the Burton Coal Company had no funds and its account with the Continental Illinois National Bank and Trust Company was overdrawn. The overdrafts during this period were: December 31, 1936, $21,776.21; February 28, 1937, $8,225.41; March 31, 1937, $10,301.13; April 27, 1937, $20,377.77, and June 7, 1937, $25,033.76. The evidence further discloses that the additional credit obtained from the bank, permitting payment of the Burton Coal Company checks notwithstanding the overdrafts indicated, was induced, in part, by the discount of fictitious accounts receivable, that is, accounts receivable represented by the Burton Coal Company and its officers as being genuine and *bona fide,* when, in fact, they were false and nonexistent. As of September 9, 1938, the Burton Coal Company had listed on its books total accounts receivable of $558,166.70, as security for bank loans amounting to $573,907.23. The actual accounts receivable, as verified by accountants, amounted only to $285,173.26. The difference represented fictitious accounts receivable. The checks were charged on the books of the Burton Coal Company as "royalty expense" and as a credit to this company's account with its subsidiary, Freeman Coal Mining Company, the amounts ultimately to be deducted from income of the latter company. Burton testi-

fied that he gave instructions to charge the amounts to his personal account. The checks, however, were not included in, nor charged to, Burton's personal account. No corporate authorization for establishment of a royalty account appears in evidence.

Burton was president and a director of the Burton Coal Company, which, in turn, owned all of the stock of the Freeman Coal Mining Company and, after May 12, 1936, all of the stock of the Seymour Coal Mining Company. On May 12, 1936, an agreement was executed between Burton Coal Company, Burton, the Continental Illinois National Bank and Trust Company and the Peoples Trust and Savings Bank of Chicago. Burton Coal Company was then indebted to the two banks in amounts of $51,333 and $88,074, respectively, and Burton in amounts of $157,097 and $9659, respectively. The agreement, after reciting the inability of either to pay the debts, provides for the recapitalization of the Burton Coal Company and the issuance by it of 1600 shares of preferred stock having a par value of $100 in the name of Burton. By the terms of the agreement, this preferred stock was deposited as collateral security to Burton's note to the Continental bank. This note was filed by the bank as a claim in the reorganization proceedings. Subsequently, the note and the collateral security were sold to William J. Krugly, for the use of Material Service Corporation, for $150,000, who now stands in the shoes of the bank as a creditor. The evidence further discloses that, upon the execution of the agreement of May 12, 1936, Burton was required to furnish a statement of his assets and liabilities. The property in controversy was not listed by him as an asset. Moreover, on May 15, 1938, Burton executed an affidavit in which, after referring to the "coal lands and lease acquired by me from the Chicago, Wilmington and Franklin Mining Company, * * *" Burton concludes with the statement that "this was pur-

chased by me for use of the Burton Coal Company, to be mined through the shaft of the Freeman Coal Mining Company." In answer to an inquiry as to the purpose of its execution, Burton stated "The statements made were undoubtedly for the purpose of helping the companies do whatever they were trying to do."

September 7, 1938, reorganization proceedings were instituted in the district court of the United States for the northern district of Illinois, eastern division, against the Burton Coal Company, the Freeman Coal Mining Company and the Seymour Coal Mining Company. J. Roy Browning was, on September 9, 1938, appointed trustee of the estates of the corporate debtors. Burton was employed by the trustee on a salary, in the capacity formerly occupied by him, and he participated actively in the operation of the debtor companies' business. On December 13 and 16, 1938, under official examination by Browning, as trustee, Burton testified that the lands in controversy were paid for and owned by himself and his wife. Browning also testified that Burton informed him on many occasions that the companies were indebted to him in large amounts of money, and that he, Burton, had not been paid any salaries, amounting to $40,000 per year, by the companies for seven years. In subsequent conversations with Browning, he reiterated his claim of ownership, stating that he, Burton, had been receiving a royalty of ten cents per ton for all coal mined previously to the reorganization proceedings and that he expected to receive a similar amount as royalty from the trustee. From the time of his appointment as trustee, Browning continued to mine the property until April 1, 1942, when, pursuant to orders confirming the plan of reorganization and the instruments executed by him as trustee, all of the assets of the three debtor corporations were turned over to the newly organized Freeman Coal Mining Corporation, the present plaintiff. Dur-

ing his incumbency as trustee in the reorganization proceedings, he paid Fred A. Burton royalties of $22,451.16 on the lands in controversy.

To reverse the decree, defendants first contend that Browning, as trustee, having recognized Burton's ownership of the land and having paid him royalties, the relationship of landlord and tenant was created, and that, therefore neither Browning nor his successor in title, the Freeman Coal Mining Corporation, could dispute Burton's title as landlord. Defendants maintain that Browning had full knowledge of the existence of the relationship of landlord and tenant with Burton, having been in possession of the books and records of the Burton Coal Company and its subsidiaries and of the checks constituting the payments for the land, segregated from a number of other checks; that Browning had discussed with representatives of the Continental bank, the largest creditor, the payment of royalties to Burton, and that the Freeman Coal Mining Corporation, having succeeded to the rights of the trustee as a tenant, and having continued to mine the coal, the relationship has not changed. Plaintiffs, on the other hand, insist that the trustee was without power to create an estoppel against a bankruptcy estate, or its successor in interest, in the absence of an order of court authorizing such action. Browning, as a bankruptcy trustee, was an officer of the court as fully under its control as would be a receiver. (*Pearson* v. *Higgins,* 34 Fed. 2d 27.) The powers of a trustee in bankruptcy are circumscribed; he can, in important matters, act only with approval of the court and must keep the court fully and frequently advised of his actions as trustee. (*Imperial Ins. Co.* v. *Livingstone,* 49 Fed. 2d 745.) It is uncontradicted, and the master so found, that Browning at no time applied to the district court for specific leave to enter into a contract with Burton for the payment of royalties, or that no notice was sent to any creditor with respect to any arrangement made by

him as trustee, with Burton, as to the land in controversy. In *Western Pacific Railroad Co.* v. *Baldwin,* 89 Fed. 2d 269, a question arose as to whether a voting trust agreement entered into between the Missouri Pacific Railroad Company and other railroads had been extended. The extension had been requested by one of the trustees, apparently acting within the scope of his authority. The request was, however, held ineffective until, and unless, the court gave proper authority to the trustee. In *State* v. *Farmers & Merchants Nat. Bank,* 114 Neb. 378, a receiver in equity undertook to issue a certificate to a depositor of a closed bank and to recognize an assignment by a depositor to the claimant as a first lien. Upon presentation of the certificate to the court by the assignee, its execution was decided to be beyond the powers of the receiver, and, hence, of no effect.

Apart from the lack of authority in the trustee to alienate important rights possessed by the debtor estates, this court has held, as an exception to the general rule, that where entry into a lease was induced by artifice, fraud or mistake, the tenant can assert better title in himself, or in any other third person under whom he claims, and may disregard his present attornment. (*Carter* v. *Marshall,* 72 Ill. 609; *Anderson* v. *Smith,* 63 Ill. 126.) These authorities become pertinent upon consideration of the false statements previously made by Burton to the trustee in which he, Burton, claimed to be the owner of the property in controversy, together with Burton's confirmatory false statements that the Burton Coal Company checks represented his own money and were charged to his personal account. Burton neither denied these statements nor their falsity. Burton's conduct thus places him in the anomalous position of having admitted commission of the fraud charged against him but, at the same time, claiming that he should be permitted to enjoy the fruits of his misconduct, because of things done or not done by Browning, as

trustee. In other words, Burton seeks enrichment out of his own fraud, with the sanction of law, because of the failure of the representative of the Federal court to express himself in apt time and on the proper occasion. "It is elementary that one who is guilty of fraud cannot urge estoppel against the other party to the contract for the purpose of making his fraud effective." (*New York Life Ins. Co. v. Odom,* 93 Fed. 2d. 641.) Estoppel is intended to prevent fraud, not to further it. (*Harvin v. Blackman,* 108 La. 426.) In *Paw Paw Savings Bank v. Free,* 205 Mich. 52, Free, while president of the Paw Paw Savings Bank, executed in his name a lease for a part of the premises occupied by the bank. Subsequently, Free subleased to the bank, which went into possession and paid rent, until a date in 1917, when Free served notice on the bank to surrender possession. Other directors besides Free knew of the execution of the lease by him in his name and, notwithstanding this knowledge, permitted the bank to continue as Free's tenant. Free also urged that an estoppel existed against the bank to deny Free's title as landlord. The court held that no estoppel existed, because to apply the doctrine of estoppel under such circumstances would enable Free to secure an unfair advantage by a breach of trust and consummate a wrong to the corporation with which he then occupied the fiduciary relationship of director and president. *Gallagher v. Duhigg,* 218 Iowa 521, is substantially to the same effect.

Defendants next urge that the right to bring an action in equity arising out of the perpetration of a fraud is not assignable, being claimed to be contrary to public policy and savoring of the character of maintenance. *Norton v. Tuttle,* 60 Ill. 130, and *Illinois Land and Loan Co. v. Speyer,* 138 Ill. 137, are cited to support this contention. Initially, it is to be observed that the present action is incidental to a conveyance by a trustee, under the direction of a Federal court in a proceeding under the Bankruptcy Act.

The order of the Federal court, in turn, has for its basis, among other things, fraud on the part of Burton Coal Company and of Burton, himself, in hypothecating with the Continental Illinois National Bank and Trust Company, their largest creditor, all of the shares of the Burton Coal Company together with fictitious accounts receivable as collateral security to obtain, on credit, additional funds later wrongfully diverted to the benefit of Burton and his wife. The right to institute the present action, therefore, devolved upon Freeman Coal Mining Corporation by order of court and as a matter of law, rather than by virtue of any voluntary act of the Burton Coal Company, its predecessor in title. The transaction is thus clearly distinguishable from a pure assignment. Moreover, it is conceded that a right of action existed in favor either of Browning, as trustee under the Bankruptcy Act, or the Continental bank, as a creditor, for a wrongful diversion by Burton, to pay for lands taken in his own name, of money of the Burton Coal Company. Defendants insist, however, that neither the trustee nor the bank having asserted such right of action, it did not survive to plaintiff Freeman Coal Mining Corporation, for reasons of sound public policy designed to avoid maintenance and to confine actions based upon fraud to the party who has suffered from the fraud. The stringent rule enunciated in the cases cited in support of the contention is no longer in effect in this State. *Warner* v. *Flack,* 278 Ill. 303, contains an exhaustive analysis of the rule and the reasons for it. There, upon Warner's death subsequent to his conveyance to defendants, his widow and heirs were in a position analogous to the one occupied by plaintiffs here, namely, possessing merely a right to file a complaint in equity for the fraud committed by defendants upon their predecessor in title. Nevertheless, the Warner heirs were allowed to recover, the court holding that to sustain the general rule prohibiting the action would constitute a defect in the law. This court

there pertinently observed: "The text writers generally state, and the cases have decided, the rule that a right of action for fraud cannot be assigned at law or in equity. The decisions were based on the ground, first, that such assignments are contrary to the policy of the law against maintenance or champerty; and second, that they are contrary to the prohibition of the common law against the conveyance or transfer of property in the adverse possession of another. This prohibition no longer exists, and an absolute conveyance of property, real or personal, is not within the reason of the first ground of objection. Therefore many decisions of the courts are now found which in the application of the rule, or as an exception to it, hold that a conveyance of property in the adverse possession of a third person under a voidable title carries with it the incidental right of the grantor to maintain a suit in equity to set aside the voidable title."

Finally, defendants contend that the trial court was not warranted in declaring Burton a trustee for Burton Coal Company in the acquisition of the lands in controversy, where it was not shown (1) that the Burton Coal Company ever had an existing right or an expectancy in the land, or (2) that the land was necessary to the continuance of its business or that its purchase in some way impaired the value of the properties of the Burton Coal Company. To support this contention, defendants rely upon *Tierney* v. *United Pocahontas Coal Co.* 85 W. Va. 545, *Lincoln Stores, Inc.* v. *Grant,* 309 Mass. 417, and *Lagarde* v. *Anniston Lime & Stone Co.* 126 Ala. 496. Common to each of these three cases and rendering them inapplicable is the distinguishing feature that the corporate officers involved, in making the purchases of which complaint was made, did so with their own funds. The existence of this fact, in part, necessitated a consideration of the relative rights and duties of a corporation and its officers to determine where the equities lay. Here, the undisputed evidence

clearly discloses that substantially all of the money used for the purchase of the property came from the Burton Coal Company, at a time when it and its subsidiaries were heavily indebted to the Continental bank and when the corporation had already overdrawn its account, the additional credit having been obtained by pledging with the bank fictitious accounts receivable, as previously recounted. In addition, here, the corporation and its subsidiaries were the subject matter of reorganization proceedings in the Federal court, under the Bankruptcy Act, and title to the real estate is, admittedly, still in defendants' names only because the trustee failed to institute, in apt time, the action necessary to reduce the property to his possession, but, instead, believed Burton's false statements as to ownership, apparently without investigating or applying the information in his possession which would show otherwise. The action of the trustee, and his failure to exercise the functions within his power as such trustee, should not be the means of affording Burton and his wife a basis for retention of title to the property as against the claim of the corporation so defrauded. To countenance such a claim, as observed in *Warner* v. *Flack,* 278 Ill. 303, would constitute an admission of a defect in the law governing cases of this nature. The evidence proclaims the fraud practiced upon Burton Coal Company and its creditors, and the findings of the master in chancery, approved by the chancellor, to the effect, among other things, that a trust should be impressed upon the property in favor of the Burton Coal Company, which, in turn, should be deemed to have been conveyed to the Freeman Coal Mining Corporation, one of the plaintiffs, are amply supported by the evidence.

The decree of the circuit court of Cook county is affirmed.

*Decree affirmed.*