PASQUALE DeMARCO, Plaintiff-Appellee, *v.* UNIVERSITY OF HEALTH SCIENCES/THE CHICAGO MEDICAL SCHOOL, Defendant-Appellant.

First District (4th Division)    No. 61574

Opinion filed July 14, 1976.

BURMAN, J., dissenting.

Sonnenschein, Carlin, Nath & Rosenthal, of Chicago, for appellant.

George R. Bieber, Stewart D. Spitzer, and Sherman C. Magidson, all of Chicago, for appellee.

Mr. JUSTICE DIERINGER delivered the opinion of the court:

The defendant, University of Health Sciences/The Chicago Medical School, an Illinois not-for-profit corporation, appeals from a judgment of the circuit court of Cook County compelling it to issue the degree of Doctor of Medicine to the plaintiff, Pasquale DeMarco.

The issues on review are whether a court has the authority to compel the award of an academic degree, whether the plaintiff complied with the requirements of the degree of Doctor of Medicine, whether the plaintiff has suffered harm which would justify equitable relief, whether the plaintiff is estopped from avoiding a special agreement with the school, whether the plaintiff's claim is barred by the doctrine of "unclean hands", whether the plaintiff's claim is barred by *laches,* and whether the court erred in permitting testimony barred by the Dead Man's Act.

The plaintiff graduated from Long Island University in June of 1940 and enrolled in the Middlesex Medical School, an unaccredited institution located in Waltham, Massachusetts, in September of 1940. He testified he became disillusioned with its program and its financial ability to continue in operation. As a result he attended classes irregularly and was dismissed by Middlesex.

On July 19, 1941, DeMarco applied for admission to the Chicago Medical School, which at that time was also unaccredited. One of the questions on the application inquired: "Have you attended another medical school?" DeMarco answered "no," believing the question was directed at whether he was seeking to transfer credits. He erroneously testified that the next question on the application inquired as to what credits he might be seeking. Another question on the two-page application inquired as to why the student was applying to the school. DeMarco answered: "I am applying because I heard through a friend of mine that Dr. Bergmann of Middlesex Medical School considers the faculty at this school one of the best, especially the anatomy department."

DeMarco was admitted to the school and began classes on September 29, 1941. From that time to June 17, 1944, the plaintiff successfully completed all but the final six weeks of his senior (fourth) year. At the end of the third year, he had a ranking of 23 in a class of 58.

As a result of correspondence with the plaintiff's draft board, the Chicago Medical School discovered that he had attended the Middlesex Medical School. When confronted with the information by Dr. Sheinin, the dean of the school, DeMarco replied it was common knowledge that he had. After a promotions committee meeting, Dr. Sheinin dictated a letter of "resignation" to his secretary, Miss Lubeck. She typed it and then

DeMarco copied it in his own handwriting. DeMarco testified Dr. Sheinin told him that if he entered the armed forces and was honorably discharged, he would be readmitted. At that time the school's catalog provided:

> "The school reserves the right to accept students with the unconditional understanding that they may be required to withdraw at any time for failure to conform with the rules of the school, of if found by the Faculty Council to be unfit to pursue the study of medicine. * * * "

At the time of his "resignation" he was six weeks short of completing his fourth year of medical school, at which time he would have qualified for a Bachelor of Medicine degree. A Doctor of Medicine degree was awarded upon completion of a year of internship to students who so qualified.

DeMarco testified that shortly before being dismissed he had a conversation with Dr. Sheinin and Miss Lubeck concerning his failure to make a $500 contribution to the school as he had promised. He said he did not have the funds at that time because his father had just died. Dr. Sheinin stated the school could not live on promises. Miss Lubeck told DeMarco that he was the only student who had not contributed. She had a list of names with dollar amounts written alongside them, and he could see there was no figure written alongside his name.

DeMarco was honorably discharged from the armed services in 1946 and sought readmission to the school, but was rejected. His attempts to be readmitted in 1947 and 1948 were also rejected. After 1948, he worked as a detail man for a pharmaceutical firm and owned and operated several nursing homes. Since 1955 he has operated and expanded the Northwest Hospital in the City of Chicago as executive director.

In the early 1950's DeMarco had a conversation with Dr. Sheinin concerning his readmission. Dr. Sheinin told him he was trying to get committees together to reaccept him into the school.

In 1968 DeMarco went to Dr. Leroy Levitt, who was the dean of the school at that time. Levitt told him there was a completely new board and he had not made any efforts to make friends, that he had not made any contributions to the School to make himself known. DeMarco replied he had given $7500 a few years earlier, but that Dr. Sheinin had failed to publicize it. In 1968 or early 1969, DeMarco went to see Sol Hoffman, a trustee of the school. DeMarco related his story to Hoffman, who said he would look into the problem. As a result DeMarco met with Dr. Taylor, the president of the school. Taylor told him that it required a lot of money to educate a student and that the tuition fees charged were not adequate for this purpose. Every returning student was expected to contribute his share. DeMarco said he would contribute $40,000 and on December 30, 1969, made a first installment payment of $2500 toward his pledge.

On September 9, 1970, Dean Levitt reported to the faculty council as follows in relevant part:

> "I wish to bring to your attention a matter that has weighed heavily upon the conscience of this institution for almost three decades. It is time now for us to consider rectifying this decision, and giving Mr. DeMarco an opportunity to participate in this correction. The fundamental moral issue here is that a punishment was levied against Mr. DeMarco that possibly far exceeded the 'crime.' He was also probably given other assurances and qualifications, but when fulfilled, did not reverse the primary decision. The basic facts are briefly as follows.
>
> * * *
>
> Mr. DeMarco's defense as to the falsification of his application to the Chicago Medical School was on the basis that the question posed was not pertinent insofar as he was not asking credit for the brief work in a Class B medical school that was in the process of disintegration. Aside from the fact that the Chicago Medical School, between the years 1940-1950 was struggling valiantly to become accredited and therefore was, as always, exquisitely sensitive to reactions of the accrediting agencies, the issue remains that he did not openly answer that particular question truthfully. It is entirely conceivable that in his single-minded desire to study medicine, he made an assumption that Middlesex was not to be considered as a school, particularly since he had little involvement with them. Further, the application blank of that time needed or demanded no attestation of correctness by the applicant, as the case is currently.
>
> It is really the School's responsibility to check out each admitted student in the first weeks after acceptance as to the accuracy of their record. Previous record of medical school attendance (with exception of foreign schools) can be easily obtained. Swift action can be taken early; but to dismiss, expel, or have withdraw a student 6 weeks before commencement on the basis of a misstatement 4 years previous seems to be a punitive exactment of extraordinary severity and is morally unjustifiable."

On September 18, 1970, Dean Levitt wrote a letter to the plaintiff stating that the board of trustees had rescinded its previous action of January 30, 1948, in which he was denied admission and recommended to the administration that a favorable consideration be given his request for readmission to the fourth year of the medical curriculum. The letter also stated that the Committee on Admission had recommended he be readmitted providing specific requirements were met. Those requirements are as follows:

1. Three letters of recommendation.

2. A passing grade on Part I of the National Board Examination.

3. Completion of four quarters (48 weeks) of full-time clinical clerkships, which would include all of the major subjects.

4. A passing grade on Part II of the National Board Examination.

The letter concluded: "It is my understanding that in your preliminary discussions with Doctor Taylor and Doctor Shaffer, you indicated that these requirements were reasonable and that you wished to undertake this task. After a lapse of 26 years, we all appreciate the difficulties involved, and I want to assure you that we shall be as helpful as possible."

DeMarco testified that Dr. Levitt read him that letter before sending it, and he protested against taking Parts I and II of the National Board Examinations, as follows:

"And I said, that this is an awful imposition.

And he said, 'well, that is the only condition that you could come back under.'

And I said, 'But why do I have to take Part I and Part II when I don't anticipate practicing medicine.'

And he said, 'Because we want you to be a practicing doctor.'

And I said, 'Well, if this is the only condition that I could get back in I will try to do my best.' "

Part I of the National Board Examinations is generally given to students upon completion of their second year of medical school and tests subjects taken in the first two years; Part II is given upon completion of the fourth year and tests subjects taken in the last two years. That passing Parts I and II was a heavy burden was testified to by Sol Hoffman. He related a conversation he had with a doctor who was also a member of the board of trustees who stated, "I've been in the academic world of medicine all my life, and I wouldn't undertake to write this examination under any circumstances."

To help DeMarco meet the requirements Dr. Levitt offered tutoring and help from the administration. DeMarco himself looked at past examinations and knew how difficult they were.

In the summer of 1971, DeMarco failed both his first clerkship and Part I of the National Boards. He then had a discussion with Dr. Taylor with respect to whether he would be permitted to continue with his studies. The result of the conversation was that the school would allow him to take the clerkship over and he would have until September of 1974 to pass both Parts I and II of the National Boards. If that arrangement was not satisfactory, it was indicated to him that he would not be permitted to continue. Dr. Levitt again offered to provide him with help to prepare for the examinations.

DeMarco testified that because of the unfairness of the requirement he

had not believed the school would actually make him take the Boards and as a result did not study for them. Neither his fellow students nor the doctors where he took his clerkships could understand why he was being made to take them.

Thereafter, he successfully retook the clerkship he had failed and passed all the others while earning favorable evaluation remarks. He was scheduled to retake Part I of the Boards on September 5-6 of 1973, and to take Part II in September of 1974, but brought this suit in September of 1973.

■■ The defendant contends that a court may not mandate the award of an academic degree because the faculty alone has the right to determine whether a student has performed all of the conditions required for a degree. The record shows the court considered the academic qualifications of DeMarco, and compared his accomplishments with the degree requirements found in the 1941 bulletin of the school which comprised the terms of the contract between the school and DeMarco. A contract between a private institution and a student confers duties upon both parties which cannot be arbitrarily disregarded and may be judicially enforced. (*People ex rel. Cecil v. Bellevue Hospital Medical College* (N.Y. 1891), 60 Hun. 107, 14 N.Y.S. 490; *Baltimore University v. Colton* (1904), 98 Md. 623, 57 A. 14; *State ex rel. Nelson v. Lincoln Medical College* (1908), 81 Neb. 533, 116 N.W. 294.) In the case of *Greenhill v. Bailey* (S.D. Iowa 1974), 378 F. Supp. 632, the court noted that a decision of the school authorities relating to the academic qualifications of the students will not be reviewed, but a plaintiff is not without a remedy when it is alleged that a decision to dismiss a student, supposedly for academic deficiencies, was made arbitrarily and capriciously and in bad faith. Also see *Connelly v. University of Vermont and State Agricultural College* (D. Vt. 1965), 244 F.Supp. 156.

DeMarco's failure to graduate was never a question of academic excellence, but was a question of whether he had complied with all the conditions which could legitimately be imposed on him after he had been dismissed for reasons extraneous to any scholastic considerations. The cases cited by the defendant, *People ex rel. Pacella v. Bennett Medical College* (1917), 205 Ill. App. 324, and *People ex rel. Tinkoff v. Northwestern University* (1947), 333 Ill. App. 224, merely stand for the proposition that courts are not qualified to pass an opinion as to the attainments of a student in medical science and that courts will not review a decision of the school authorities relating to the academic qualifications of the students.

■■ The defendant also contends the plaintiff has not satisfied the requirements of the 1941 contract which required a five-year course of study, including a year of internships which the plaintiff did not complete.

Because the defendant made it impossible for the plaintiff to take the year of internships in 1944, and because the fifth year of internships is no longer required for a degree of Doctor of Medicine, it must be concluded that the year of clerkships taken by the plaintiff was intended by the School to substitute for the fifth year of internship.

■■ The defendant next suggests the plaintiff suffered no harm which would justify equitable relief, because there was no allegation or proof of monetary damage. We believe that withholding a diploma conferring the degree of Doctor of Medicine is a unique injury of which the courts will take cognizance. The 1941 contract provided for the issuance of a diploma at the successful completion of their academic program as stated in their catalog. The evidence established the plaintiff earned the degree, and it was proper for the court to order the mandatory injunction. A party pursuing his legal rights in a legal manner cannot be challenged with respect to the motives which prompt him into action. *Missouri Pacific Ry. Co. v. Flannigan* (1892), 47 Ill. App. 322.

The defendant argues the plaintiff is estopped from avoiding the 1970 agreement with the school which required him to pass Parts I and II of the National Boards because he accepted the benefits of being readmitted and being allowed to take the clerkships, citing *Board of Education v. Herzog Construction Co.* (1961), 29 Ill. App. 2d 138, and *Thomas v. 4145 Broadway Hotel Co.* (1950), 342 Ill. App. 308. The defendant asserts that a special degree candidacy program was developed for the plaintiff, and he would not have been readmitted if he had not agreed to it.

■■ This argument fails to take into consideration the whole thrust of the trial court's opinion that the defendant did not act in good faith when it dismissed the plaintiff in 1944 because it imposed a contribution requirement which was arbitrary and capricious and should not legitimately be a condition precedent to graduation. The 1970 agreement merely promised to do something it was already obligated to do under the 1941 contract. In return it asked for a $40,000 pledge and received payments of $20,000.

DeMarco was forced to resign in 1944 officially because he had failed to disclose his prior attendance at an unaccredited medical school. However, in the words of Dean Levitt: "Swift action can be taken early; but to dismiss, expel, or have withdraw a student 6 weeks before commencement on the basis of a misstatement 4 years previous seems to be a punitive exactment of extraordinary severity and is morally unjustifiable." The trial court found that DeMarco was in reality being punished for failing to make good on a $500 pledge.

That such practices were and are a part of the official conduct of the school was shown at trial. The exhibits introduced into evidence document that the same practices continued through 1973. An analysis of

those exhibits shows that in 1970, at least 64 out of 83 entering students had pledges made in their behalves totalling $1,927,900. The pledges varied in amounts from $1400 to $100,000 and averaged $30,123. In 1971, at least 55 out of 83 students had pledges made in their behalves totalling $1,893,000. The pledges varied in amounts from $3000 to $100,000 and averaged $34,418. In 1972, at least 73 out of an entering class of 92 had contributions made in their behalves totalling $3,111,000. The pledges varied in amounts from $20,000 to $100,000 and averaged $42,603. In 1973, at least 78 out of 91 students had contributions made in their behalves totalling $3,749,000. The pledges varied in amounts from $10,000 to $100,000 and averaged $48,064. In addition, there were amounts pledged and partial payments made for students who did not enter or dropped out shortly after entering.

In a memo to Herman Finch, a member of the board of trustees, in June of 1971, Dr. Taylor outlined the official policy on admissions. That memo provides in relevant part:

"Now, let us review the matter of admission of students to the medical school. We can accept only 83 students in the entering class. For each of these places, there are 30 to 40 qualified applicants. A Faculty Admissions Committee laboriously spends hours culling through the applications considering academic records, scores on the MCAT, recommendations of pre-medical advisors, health reports, the applicant's own statement of his reason for studying medicine, his extra-curricular records, etc., etc. Then, without reference to his race, religion or social background, the Committee decides on whether he should be placed in the 'acceptable pool'—a collection of some 350 whom the Committee says, in effect, if we had that many places, these are the ones. It is from this pool that the 83 will be selected by the Administration. Quite early those with top academic records will be sent letters of acceptance. These number some 75 to 80, and of that number, some 10 to 15 will accept our offer. Next, those members of minority groups such as Blacks, Spanish-American, Oriental, who have been placed in the pool will be offered a place. Children of alumni and residents of Illinois are given a degree of preference in all admissions. Finally, we come to a point when there are some 200 applicants in the pool all of whom are qualified and have been approved, and from whom the remainder of the class will be selected. These applicants could be arranged in a number of arbitrary ways: the science grades, the MCAT scores, the social background of parents, or even their heights. Any one of these or a combination would be just that—an arbitrary arrangement. And we know that none of these criteria are absolute indicators of

success or failure in medical school. Now that the State of Illinois provides a stipend for each resident enrolled in a private medical school, such applicants are in a favored position because CMS like all private schools must depend on a variety of sources for financial support. Our educational costs are now at least $15,000 per year per student. Tuition is now $2,500 per year, leaving a deficit of $12,500 per year per student to be raised by knocking on doors. This we accept as our responsibility. If, however, a parent, friend or foundation comes to us and says that he will give or get all or a major portion of the difference in cost of education for an applicant who has been judged acceptable by the Committee, naturally we like any other private school will tend to favor that applicant. It should be perfectly clear and understood by all that no matter what financial considerations are offered, unless an applicant has been approved by the Faculty Committee, the applicant cannot be offered a place in the class."

As a result of their admissions policies, Dr. Taylor admitted that it was possible the Chicago Medical School rejected applicants with higher undergraduate grade-point averages in favor of applicants who had contributions made in their behalves. In the minutes of a board of trustees meeting for May 8, 1968, the matter was raised as follows:

"Considerable concern had been expressed by the Executive Committee and other members of the Board regarding the selection of students for admission to this year's entering class. It appears that students with less than the agreed upon minimal average have been accepted while a number of academically better qualified students have been rejected or are still pending. Perhaps this has been due to the inexperience of the Admissions Committee, the directions given to the committee by the administration and/or accepting too many students too early."

Mr. Finch stated that admission was done by the president with the approval of the dean, but Acting Dean Henri Havdala stated he had nothing to do with student selection and was told by Dr. Taylor to refer all calls to his office.

Mr. Finch also stated that the guideline for the amount of a contribution was the amount of the deficit per student listed in the annual report. He would refer potential contributors to that report, but he would not directly suggest an amount to be contributed.

Mr. Hoffman testified he was familiar with the deficit of the school concerning each student and tried to achieve or reach that deficit in connection with the people who talked with him on behalf of an applicant. He had discussed the matter with Mr. Finch, who directly told him to try to achieve a dollar amount equal to the deficit. He further

testified that if a pledge was not made, he never communicated with the school, and the applicant, to his knowledge, was never admitted to the school.

This evidence demonstrates the school's overriding concern with contributions which caused it to act in an arbitrary and capricious manner. DeMarco had tried several times to enforce the school's promise after his return from the military, and it was only by making a $40,000 pledge that the school saw fit to readmit him. Even then it imposed the almost impossible burden of having to pass Parts I and II of the National Boards, despite the fact those examinations were not required to obtain a degree in either 1941 or 1970. The 1970 requirement whereby the plaintiff was required to demonstrate current knowledge of medicine by passing Parts I and II of the National Boards was not responsive to the injustices done to him in 1944 when he was dismissed or in later years when he was denied readmission, and reflects the inequitable use of power by the school. The extra requirement of demonstrating current medical knowledge was arbitrary and unreasonable, in light of the fact the examinations have never been required for a degree, then or now. It is recognized a school is entitled to enter into a special degree program with a student with whom there has been no previous history of bad faith; however, in this case the school admittedly acted in bad faith as stated by Dean Levitt. It is clear the school was not entitled to treat DeMarco as a stranger considering its past treatment of him and any agreement must be fair and equitable. Because the school was not accredited when the plaintiff first attended, he could not transfer his credits to any other medical school and had no alternative but to agree to whatever conditions the school might choose to impose. Under these circumstances the doctrine of equitable estoppel may not be invoked by the school. The doctrine was intended to prevent injury and not to promote it. *Freeman Coal Mining Corp. v. Burton* (1945), 388 Ill. 604.

■■ The defendant next contends the plaintiff's claim for relief is barred by the doctrine of unclean hands by asserting that DeMarco agreed to take the examinations even though he had no intention of doing so. The record does not support this assertion. He objected to the requirement in conversations with both Dr. Taylor and Dr. Levitt, but agreed to try his best when the school remained firm in its insistence. Nevertheless, he did not fully believe the school was serious in its demands to take the examination and was imposing the requirement only temporarily to overcome resistance to his readmission by certain people. He believed the requirement would be rescinded.

Even after he failed the examination the first time and specifically agreed to retake it, he believed the unfairness of the requirement would

result in its being lifted. This belief was encouraged by his fellow students and doctors at the hospital where he completed his clerkships, who voiced their opinions that the requirement was oppressive, particularly in his case. It was only some time after promising to take the examination for the second time that he began to consider the idea of not taking it.

It is clear from the circumstances surrounding this case that DeMarco tried every possible avenue to earn his degree, and only filed suit when his good faith efforts were thwarted by an arbitrary and unreasonable requirement.

■■■ The defendant next contends the plaintiff's claim is barred by *laches* because of the passage of time, the death of witnesses, and the fact that every applicable statute of limitations has long since run. Whether a party has been guilty of *laches* is a question addressed to the sound discretion of the trial court (*Johnson v. Central Standard Life Insurance Co.* (1968), 102 Ill. App. 2d 15), and the decision of the trial court will not be disturbed on review unless the determination constitutes an abuse of discretion. *Trustees of School v. City of Chicago* (1941), 308 Ill. App. 391.) The question of *laches* does not turn merely upon the passage of time, but depends on whether the opposing party has been prejudiced by the delay. (*Pyle v. Ferrell* (1958), 12 Ill. 2d 547; *Carlson v. Carlson* (1951), 409 Ill. 167.) The doctrine was created to promote justice, and not to protect fraud or injury. In the case of *Messick v. Mohr* (1937), 292 Ill. App. 69, 74-75, the court stated the rule as follows:

> "There is no fixed time that is held to apply in bar of actions in equity. Where it is necessary to prevent fraud or great hardship, courts of equity will grant relief, even after the statute of limitations applicable to actions at law has run, * * * What is a reasonable time cannot well be defined, but must be left in large measure to the determination of the court in view of the facts presented.

> \* \* \*

> A court of equity applies the doctrine of laches in the denial of relief only where from all the circumstances, the delay would render the relief to which the complaint would otherwise be entitled, inequitable and unjust."

■■ The record in this case discloses that DeMarco made repeated attempts over the years to be admitted, and at no time abandoned his claim to obtain a degree. At the same time there has been no change of position by the defendant which has resulted in prejudice. While it is true that certain witnesses have died, the justness of the plaintiff's claim is hardly open to question. Dr. Levitt's statement to the faculty executive council at a time when Dr. Sheinin was still alive eloquently attests to the

injury suffered by the plaintiff in 1944 and corroborates his testimony regarding his conversation with Dr. Sheinin and Miss Lubeck, hereinbefore mentioned.

The defendant contends the court's conclusion that the plaintiff was dismissed because of his failure to contribute $500 was based on uncorroborated testimony which should have been excluded under the Dead Man's Act (Ill. Rev. Stat. 1973, ch. 51, par. 4). The defendant asserts that because Dr. Sheinin died in 1972, the plaintiff was incompetent to testify as to his conversation with him with respect to the $500 contribution. This argument is based on the case of *Warszawa v. White Eagle Brewing Co.* (1939), 299 Ill. App. 509, where the court held that a mere employee was not an agent as required by the Act, and the presence of an employee was not sufficient to make the testimony of the surviving party competent. Therefore, it is argued that Miss Lubeck, who was alive at the time of trial, could not be classified as an agent; and her presence was not sufficient to make DeMarco's testimony competent.

■■ We find the facts in the instant case do not fall within the area the Act is designed to cover. Section 4 of the Act relates to the formation of contracts, and the conversation relied on by DeMarco did not refer to the contract being litigated here. Even so, the broad policy of the Act to maintain comparable positions for interested parties with respect to material matters was upheld, because Miss Lubeck could have been called to contradict DeMarco's testimony if it was contrary to her recollection.

Nevertheless, DeMarco's testimony regarding the part of the conversation with Miss Lubeck would not be barred even if the Act applied to the situation. Her comment that DeMarco was the only student who had not contributed adequately conveyed the school's primary concern with contributions and justified the court's conclusion that he was being dismissed for a reason other than his failure to accurately complete his application.

■■ We note the trial court, in its findings of fact, stated the plaintiff had repeatedly said he did not desire to take any examination anywhere, for the purpose of obtaining a license to practice medicine. The trial court thereupon entered an injunction *sua sponte* against the plaintiff from taking any examination anywhere for the purpose of obtaining a license to practice medicine, although there was no pleading or prayer by anyone for such an injunction. The court also found the plaintiff's academic qualifications were complete and he should be granted a degree of Doctor of Medicine. It seems illogical to us to grant the degree and then prevent the plaintiff from taking examinations for a license. It is for the plaintiff to decide whether or not he wishes to take the examination for a license, and for the examining board to determine whether or not he is

qualified to practice medicine. We hold the injunction was improperly entered and the Order should be reversed.

For the reasons stated, the judgment of the Circuit Court of Cook County is affirmed as to the granting of the degree, and is reversed as to the Order entering the injunction.

Affirmed in part and reversed in part.

ADESKO, J., concurs.

Mr. JUSTICE BURMAN, dissenting:

By its decision today, the majority of this court has ordered the Chicago Medical School to issue a diploma conferring the degree of Doctor of Medicine to plaintiff, even though the faculty of the school for good cause found him unqualified. I believe this decision to be wholly unwarranted.

The record reveals the school made a rare and earnest exception to its admissions policy in this case and allowed plaintiff to reenter the institution under an agreed degree program, despite the fact that he had withdrawn from the school 26 years earlier and had not studied medicine since. As stated in the school's brief, the gist of the complaint was that although plaintiff expressly agreed to the terms of a special candidacy program, he should somehow be judicially relieved of those requirements. Admittedly, the requirements were most stringent and perhaps almost impossible to fulfill. Nevertheless, the majority has imposed an order on the school to issue plaintiff a doctoral degree that has not been earned. I believe this conclusion to be inappropriate both at law and in equity; for universal precedent dictates that it is the function of the learned faculty, and not the court, to determine the qualifications of a student.

For the most part, the facts of the instant case are not disputed. Plaintiff was admitted to the Chicago Medical School in 1941. In 1944 the school discovered that he had falsified his medical education history in his application for admission. In fact, the school learned that plaintiff had attended another medical school whose records indicated that he had been dropped for "low scholarship." Thereafter, the school notified plaintiff of its discovery and asked him to leave. The school records indicate that plaintiff withdrew at his own request in lieu of dismissal for falsification on his admission application. At the time of his withdrawal, the school awarded a Bachelor of Medicine degree to those students who had successfully completed four years of medical school study. It is undisputed that plaintiff had not completed his fourth year of medical school at the time of his withdrawal. Moreover, he was more than one full academic year away from eligibility for a Doctor of Medicine degree.

Had plaintiff been asked unjustly to leave the school in 1944, he could have then brought an action for a mandatory injunction to compel the school to issue the degree of Doctor of Medicine to him. He did not do so, obviously because he knew that he had not earned the degree. His attempts to be readmitted in 1947 and 1948 also were rejected, yet he filed no suit. Thereafter, plaintiff intermittently tried without success to be readmitted, but he filed no action. It was not until 1970, when a new board of trustees controlled the school, that plaintiff gained entry.

When plaintiff applied for admission in 1970, the school necessarily faced the questions of whether he should be admitted and under what circumstances. Clearly the situation was unique. While plaintiff had completed many of the requirements of a 1940's medical degree, he had not pursued any medical studies for over 25 years. The faculty admissions committee thoroughly discussed the matter, and eventually designed a special candidacy program which would grant plaintiff a fair opportunity to pursue his degree without diluting the integrity of the degree itself. The program required among other things that plaintiff pass Parts I and II of the National Medical Board Examination and that he complete at least one year of clinical training in the form of a clerkship. The record establishes that the school clearly, repeatedly and fully described the program to plaintiff and that he knowingly accepted its terms.

At the time the program was presented to him, plaintiff did not commence an action claiming the requirements to be unfair. Nor did he bring a suit challenging the school's right to impose said requirements. Rather, plaintiff agreed to be accepted as a "special student" and started his academic course pursuant to that program.

Plaintiff failed his first clerkship in 1971 since his professional knowledge and judgment were rated as "poor." Nevertheless the school permitted him to continue his studies and he subsequently passed the course. In 1971 plaintiff also failed Part I of the National Boards. The school, however, granted him permission to retake Part I in September of 1973 and to take Part II one year later. Plaintiff never retook Part I of the Boards, nor did he ever attempt to pass Part II. Instead he filed the instant action in September of 1973.

Much is made by the majority about plaintiff's numerous and generous contributions to the school. If this be the source of the majority's dissatisfaction, I cannot share it. No contention is made that plaintiff was promised a degree if he made contributions. The contrary is true. The school futilely offered him assistance to prepare for the Boards, but he rejected any such help. He has not fulfilled the degree requirements under his special contract with the school, and as such is precluded from claiming the Doctor of Medicine degree. The trial court erred in not dismissing the complaint.

The ability of schools and students to make mutually binding agreements in special situations has rarely been questioned and never judicially doubted. The case of *Anthony v. Syracuse University* (1928), 224 App. Div. 487, 231 N.Y.S. 435, is directly in point. In *Anthony* the plaintiff signed a special agreement upon her entrance to the defendant university in which the defendant reserved the right to dismiss the plaintiff at any time. When plaintiff was dismissed pursuant to that agreement, she sued, claiming that the school could not invoke a special agreement. In reversing the lower court and dismissing the complaint, the appellate court stated: "The University need not accept as a student one desiring to become such. It may, therefore, limit the effect of such acceptance by express agreement * * * ." 224 App. Div. 487, 490-91, 231 N.Y.S. 435, 439.

The courts are not learned in medical science. Thus, they are no more able to pass upon the qualifications of a medical student than is a doctor of medicine able to evaluate the capabilities of a law student. The inescapable conclusion is that a medical school must be the final judge in determining which students have earned the high degree of Doctor of Medicine. *People ex rel. Pacella v. Bennett Medical College*, 205 Ill. App. 324 (abstract opinion).

As I have indicated above, the 1970 agreement between plaintiff and the school is binding, and the court should not interfere with its terms. Nor can they circumvent its provisions under the pretense that the 1941 school bulletin is controlling. Certainly, any rights plaintiff may have had in 1944 have been lost during the 30-year interim. In no case cited by the plaintiff has the court awarded equitable relief under even remotely similar circumstances. Plaintiff makes no claim of fraud or duress. Nor does he assert that the terms of the special agreement were ambiguous or misunderstood. By requiring plaintiff to pass the National Boards, the school asked only that he demonstrate current· medical knowledge commensurate with the distinguished degree he sought. That he somehow should be excused from this or other academic requirements is meritless.

In conclusion, I would note that the majority has conferred the degree of Doctor of Medicine upon an individual who, when taking Part I of the National Boards, tallied 50 points on an exam which required 350 to pass. For these reasons I must respectfully dissent and defer to the judgment of the school.